539 F.2d 533
 JACKSONVILLE SHIPYARDS, INC., and Aetna Casualty & Surety
Company, Petitioners,
v.
Herbert L. PERDUE and Director, Office of Workers'
Compensation Programs, United States Department of
Labor, Respondents.
JACKSONVILLE SHIPYARDS, INC., and Aetna Casualty & Surety
Company, Petitioners,
v.
Charles W. SKIPPER and Director, Office of Workers'
Compensation Programs, United States Department of
Labor, Respondents.
P. C. PFEIFFER COMPANY and Texas Employers' Insurance
Association, Petitioners,
v.
Diverson FORD and Director, Office of Workers' Compensation
Programs, United States Department of Labor, Respondents.
HALTER MARINE FABRICATORS, INC., and Fidelity & Casualty of
New York, Petitioners,
v.
John L. NULTY and Director, Office of Workers' Compensation
Programs, United States Department of Labor, Respondents.
AYERS STEAMSHIP COMPANY and Texas Employers' Insurance
Association, Petitioners,
v.
Will BRYANT and Director, Office of Workers' Compensation
Programs, United States Department of Labor, Respondents.
 Nos. 75-1659, 75-2833, 75-2289, 75-2317 and 75-4112.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 27, 1976.
 
 J. Weldon Granger, Houston, Tex., for Diverson Ford.
 Charles E. Lugenbuhl, Thomas J. Grace, New Orleans, La., E. D. Vickery, W. Robins Brice, Houston, Tex., John E. Houser, Jacksonville, Fla., for petitioners.
 Marshall H. Harris, Assoc. Sol., Linda L. Carroll, U. S. Dept. of Labor, Washington, D. C., for respondents in 75-2317.
 
 
 1
 Edward A. White, Jacksonville, Fla., for Skipper.
 
 
 2
 Arthur L. Schechter, Houston, Tex., for Will Bryant.
 
 
 3
 William J. Kilberg, Solicitor of Labor, Laurie M. Streeter, Assoc. Sol., Joshua T. Gillelan, II, Atty., Ronald E. Meisburg, George M. Lilly, U. S. Dept. of Labor, Washington, D. C., for Dept. of Labor.
 
 
 4
 Petitions for Review of Orders of the Benefits Review Board, United States Department of Labor.
 
 
 5
 Before TUTTLE, THORNBERRY and TJOFLAT, Circuit Judges.*
 
 
 6
 TJOFLAT, Circuit Judge.
 
 
 7
 * AN OVERVIEW OF THESE CASES
 
 
 8
 The Parties and Their Dispute. With these five vigorously contested appeals, petitioners and respondents join battle for the third time. Each individually named respondent is a shoreside worker who was injured in the course of his employment. These respondents claim that their injuries are covered by the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act (the Act), 33 U.S.C. §§ 901 et seq. (1970). In their fight for coverage, the workers have a new and virtually untested weapon, viz., those portions of the 1972 Amendments which expanded the scope of the Act.[1] They also have a powerful and articulate ally in the other respondent, the Director of the Office of Workers' Compensation Programs of the United States Department of Labor (the Director).[2] The forces arrayed against respondents consist of the workers' employers and the employers' insurance carriers.
 
 
 9
 Procedural History. In each of the cases, a preliminary skirmish was fought before an Administrative Law Judge.[3] Reports from these battlefields show mixed results; petitioners won three of the engagements, and respondents two. The theater of operations then shifted to the Washington, D.C., headquarters of the Benefits Review Board of the Department of Labor (the Board).[4] The Board adopted an extremely liberal view of the Act's coverage, and respondents swept to victory in all five cases. After losing the fight in Washington, D.C., petitioners chose to escalate the conflict by asking this Court to review the Board's decisions.[5]
 
 
 10
 The Issues on Appeal. Before this Court, the lines of battle have been drawn with admirable clarity and good sense. Both sides have declined to assume certain exposed legal positions where they would quickly fall prey to the enemy's fire. Thus, respondents concede that the five accidents would not have been covered by the pre-1972 Act. Similarly, petitioners concede that the 1972 Amendments have broadened the Act's scope to include some shoreside injuries. The issue which divides the two camps is, of course, whether the Act was expanded far enough to reach these five injuries. We hold that the Board properly awarded benefits to two workers who were handling maritime cargo on shore, as well as to a carpenter who was fabricating parts for a new ship. However, the Board misconstrued the Act in extending coverage to the other two respondents, a shipboard worker who stumbled in front of his employer's office a mile from the ship, and an employee who was helping to tear down a shed in a disused marine repair facility.
 
 
 11
 Not content with merely jousting over the scope of the revised Act, three of the petitioners have broken ranks to seek out other casus belli. The petitioners in the Halter Marine case argue that the Act is unconstitutional if it covers injuries to shipbuilders on shore. In Pfeiffer, we are told that the Board violated the petitioners' right to due process by the method in which it awarded a fee to the claimant's attorney. The Ayers Steamship petitioners enter the lists with a plan to split the enemy forces; they claim that the Director is not a proper respondent in these appeals. As will hereinafter appear, we reject all of these additional contentions.
 
 II
 SCOPE OF THE 1972 AMENDMENTS
 
 12
 Of the many changes which Congress made in the Act in 1972, we are here concerned with only one: the extension of the Act's coverage inland to reach certain maritime-related injuries. Under the prior Act, coverage was overwhelmingly situs-oriented. As a general rule, an employee's injury was compensable if it occurred "upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law . . . ".[6] Interpretation of this provision was immensely complicated by a judicially created doctrine under which some "maritime but local" injuries could be covered by both state and federal compensation schemes. See, e. g., Calbeck v. Travelers Ins. Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962); Davis v. Department of Labor, 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942). However, the Supreme Court made it clear that, whatever the exact parameters of the "maritime but local" doctrine, the federal Act would generally be confined to injuries occurring over the waters. Thus, in Nacirema Operating Co. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969), the Court held that the Act did not cover injuries to longshoremen who were working on a pier permanently affixed to the shore. Coverage was denied despite the fact that the workers had been injured while loading and unloading ships, an employment as maritime in nature as any land-based employment could be.[7] The inequities of this "water's edge" division between covered and non-covered work were a major factor behind the decision to expand the scope of the Act.[8]
 
 
 13
 Two of the Act's new sections are pertinent to the present appeals.[9] The first of these defines the status which the affected employee must occupy to bring his injury within the Act's coverage:
 
 
 14
 The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker . . . 33 U.S.C. § 902(3).
 
 
 15
 The other provision describes the situs where a covered injury must occur:
 
 
 16
 Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). Id. § 903(a).
 
 
 17
 From these statutes, the general thrust of the new Act's coverage is clear. Congress has replaced the old "water's edge" analysis with a two-part test which requires (1) that the claimant have been engaged in "maritime employment" and (2) that the injury have taken place upon the situs specified in the Act.
 
 
 18
 The Act's definition of "maritime employment" is the focus of most of the legal controversy which rages in the parties' voluminous briefs. Unfortunately, much of this learned debate is of little relevance, if any, to the cases now before this Court. Counsel have drawn our attention to a host of pre-1972 decisions which discussed the meaning of the term "maritime employment" as used in the former Act. See, e. g., Pennsylvania R. R. v. O'Rourke, 344 U.S. 334, 73 S.Ct. 302, 97 L.Ed. 367 (1953); Nalco Chemical Corp. v. Shea, 419 F.2d 572 (5th Cir. 1969). Under the old Act, as under the present one, an employer was liable if he had one or more employees engaged in "maritime employment".[10] However, judicial constructions of the pre-1972 Act were necessarily limited by the "water's edge" approach of that statute.[11] For this reason, these older cases simply do not speak to the issue of what land-based employment is sufficiently "maritime" to be covered by the new Act.[12] Fortunately, Congress itself has answered that question. The terms of the statute allow coverage for an injured employee who was working as a longshoreman, a ship repairman, a shipbuilder, or a shipbreaker.[13] The legislative history tells us that an injured employee will be covered if he was "engaged in loading, unloading, repairing, or building a vessel,"[14] but will not be covered merely because he was injured in the area defined by new Section 903(a).[15] In light of these indicia of Congressional intent, we must agree with the Court of Appeals for the Ninth Circuit that the new Act requires such a claimant to have been engaged in the work of loading, etc. at the time of the injury. Weyerhaeuser Co. v. Gilmore, 528 F.2d 957, 960 (9th Cir. 1975). We therefore reject respondents' contention that an employee's general job classification (such as "longshoreman" or "ship repairman") will bring him within the Act's coverage regardless of the nature of the work which he was performing when he was injured.[16] In its reports, Congress has also indicated the extent to which coverage should be granted to persons who are not themselves loading, unloading, repairing, building, or breaking a vessel but who are nevertheless performing closely related functions. Thus, the House Report states that a checker would be performing covered work if he was "directly involved in the loading or unloading functions . . . ".[17] Our holding is that an injured worker is a covered "employee" if at the time of his injury (a) he was performing the work of loading, unloading, repairing, building, or breaking a vessel, or (b) although he was not actually carrying out these specified functions, he was "directly involved" in such work.[18]
 
 
 19
 We specifically reject a theory which petitioners in the Pfeiffer and Ayers Steamship cases advance as the proper rule for cargo handling operations. They claim that the Act's coverage depends upon whether cargo has reached its shoreside "point of rest", as that term is used in the maritime industry.[19] To these petitioners, men who are handling cargo on its way to a vessel are not covered by the Act until that cargo reaches its last marshaling area prior to being taken on board a ship. Similarly, under this theory men who are unloading cargo from ships are performing covered work only until they reach the first marshaling area for cargo on shore. We are unable to find any support for such a hypertechnical construction of the 1972 Amendments.[20] In our view, if Congress had wished to adopt the "point of rest" as the test for coverage, it would have made that intention clear. As it is, the "point of rest" analysis is to be found neither in the statute itself nor in the legislative history. The closest approach to such a test appears in the following passage from the House Report:
 
 
 20
 To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area . . . (E)mployees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered . . . H.R.No.92-1441, 1972 U.S.Code Congressional & Administrative News, at 4708.
 
 
 21
 In our opinion, these remarks establish no more than that workers who bring cargo to a storage area from on board ship are covered, while those persons (generally truckers or railroad personnel) who merely receive cargo and transport it inland are not covered. The House Committee in this passage did not even mention those employees who handle cargo between the first holding area and the cargo's departure via land transportation. It is precisely the treatment of this intermediate group of workers with which we are here concerned, and this passage is totally silent as to them. Elsewhere, as we have seen, the Committee indicated that employees who are directly involved in loading or unloading will be covered by the new Act. In the absence of explicit language which would establish a "point of rest" dividing line for shoreside cargo handlers, we will apply this general test to them as well.[21]
 
 
 22
 Our interpretation of the new situs provision follows the same general lines as our construction of Section 902(3). Just as we choose to ignore the labels which an employer or a union has bestowed upon an employee, and instead rely upon the employee's work function at the time of the injury, likewise we will look past an area's formal nomenclature and examine the facts to see if the situs is one "customarily used by an employer in loading, unloading, repairing or building a vessel." The clear statutory scheme is to cover employees who are injured while performing certain types of work in an area which is customarily used for such work. Whether or not an employer or local custom has decided to designate an area as a "terminal", for example, is not dispositive of the situs issue. We will require that a putative situs actually be used for loading, unloading, or one of the other functions specified in the Act. As with the "maritime employment" test, we also interpret the Act as requiring that the situs meet the statutory requirements as of the time of the injury. It will not suffice if the area was so used only in the past, or if such uses are merely contemplated for the future.
 
 III
 THE COVERAGE ISSUE IN THESE APPEALS
 
 23
 With the general tests for the amended Act's coverage in mind, we now turn to the specific facts of each of the present cases. In deciding each appeal, we must remember that the Act is to be liberally construed in favor of injured workers, see Voris v. Eikel, 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953). We are also bound by a statutory presumption that an individual claim comes within the Act's coverage. 33 U.S.C. § 920(a). Finally, we will not set aside an award made by the Benefits Review Board so long as it is supported by substantial evidence on the record considered as a whole, and so long as there is a reasonable legal basis for the Board's conclusions. See O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 508, 71 S.Ct. 470, 95 L.Ed. 403 (1951); Cardillo v. Liberty Mutual Ins. Co.,330 U.S. 469, 478-79, 67 S.Ct. 801, 91 L.Ed. 1028 (1947).[22]
 
 
 24
 A. No. 75-1659. Herbert Perdue was employed by Jacksonville Shipyards, Inc., as a shipfitter. On February 2, 1973, he performed repair work for a twelve-hour shift (7:00 a. m. to 7:00 p. m.) aboard an aircraft carrier which was berthed at the Mayport Naval Station in Jacksonville, Florida. At the end of the working day, Perdue took a bus to an office which his employer maintained approximately one mile from the carrier. The bus was provided by Perdue's employer, and the office was the place where Perdue had to "punch out" on a time clock before and after each shift. While alighting from the bus near the office, Perdue stumbled and injured his left knee in a fall upon the pavement. In our view, the Board should have sustained the Administrative Law Judge's determination that Perdue was not injured on a situs defined by new Section 903(a). There is literally nothing in the record to support a conclusion that the employer's office was on the navigable waters or in an "adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel." The vessel upon which Perdue was working was a mile away, and the "punch out" office was a purely clerical and administrative post separated from the waters by other facilities which likewise were not used for loading, unloading, ship repair, or shipbuilding.[23] Under no reasonable construction of the Act did this area either "adjoin" the waters or carry out any of the functions specified in Section 903(a). We reject the argument that the new Act covers every point in a large marine facility where a ship repairman might go at his employer's direction. In the words of the Administrative Law Judge below, the locus of this injury had "nothing to do with loading, unloading, building or repairing vessels" (Appendix at 19). Therefore we must reverse the Board's determination that Perdue is entitled to compensation under the new Act.
 
 
 25
 B. No. 75-2833. Charles W. Skipper was another employee of Jacksonville Shipyards, Inc. For many years, he had been primarily engaged in ship repair work as a welder and burner. On the morning of February 8, 1974, Skipper reported for work as usual. However, instead of being assigned to his normal duties as a ship repairman, he was sent across the St. Johns River to a disused marine facility called the Southside Yard. There, he was to assist in tearing down a building which had formerly housed a fabrication shop. The purpose of dismantling this structure was to salvage some steel for use in constructing a plant which would manufacture sandblasting equipment. The activities of Jacksonville Shipyards, Inc., are quite diversified, and the contemplated plant was a new business venture. Skipper himself had previously from time to time been assigned work, such as this salvage operation, which did not involve ship repair. On the day in question, Skipper was injured when some beams fell from the structure during the dismantling process and several steel fragments struck his forehead. At the time of the injury, all of the shops in the Southside Yard were closed, and no repair or fabrication work was being carried out there. Occasionally, ships would still be tied up at the pier in the Southside Yard, and repairmen or other workers would be sent from the employer's active facilities to work on these ships. However, such work would have no relationship to the various disused facilities in the Southside Yard, including the former fabrication shop in question, which was located between one hundred fifty and two hundred feet from the water. On these facts, we perceive no basis for the conclusion below that Skipper's injury is compensable under the new Act. Under no reasonable view was Skipper performing ship repair work at the time of his injury, nor was he carrying out any other of the types of work which the statute specifies as "maritime employment". We further hold that this salvage gang was not engaged in any work sufficiently similar to the statutory categories to be seen as a type of shoreside employment which was fairly within Congress' intent despite not being named in the 1972 Amendments. As we have already indicated, we refuse to attach controlling weight to an employee's regular job classification. Therefore, we will not consider Skipper a "ship repairman" under Section 902(3) merely because he normally performed ship repair work. We look only to his duties at the time of the injury, and these were decidedly not within the contemplation of the statute.
 
 
 26
 It is equally clear that Skipper was not injured on a situs as defined in new Section 903(a). We have held that under Section 903(a) a covered situs must be "customarily used by an employer in loading, unloading, repairing, or building a vessel" as of the time of the injury. In this case, the Southside Yard shops had been inactive for approximately a year when Skipper was injured. No repair work or any other work specified by the statute was being performed in these buildings. Therefore, we must conclude that the former shops had lost their status as ship repair or shipbuilding facilities, and that Skipper was not injured on a Section 903(a) situs.
 
 
 27
 Because we reverse the administrative finding of coverage under the Act, we need not reach the other issues discussed by the parties, such as the propriety of the award which Skipper received for a facial scar and the various requests which the claimant's lawyers have made for attorneys' fees.
 
 
 28
 C. No. 75-2289. In this case, the parties agree that the situs of the injury was within the contemplation of new Section 903(a), and the only dispute is whether the claimant was performing covered work. On April 12, 1973, Diversion Ford was injured at the port of Beaumont, Texas, while helping to secure a military vehicle to a railway flat car in preparation for its transportation inland. The vehicle in question had arrived either two or seventeen days prior to the date of the accident. Since then, it had remained in the immediate waterfront area. On the day before the injury, a gantry crane at the water's edge had lifted the vehicles onto the flat cars. Ford's work of fastening the vehicles to the flat cars was therefore the last step in transferring this cargo from sea to land transportation. On the other hand, the vehicles were not moved directly from the ship to the flat cars but instead were taken first to a storage area. There is no dispute, then, that the "point of rest" for these vehicles had intervened since their arrival in port. However, we have today chosen not to adopt the "point of rest" theory of coverage for shoreside cargo handlers. In addition to the general reasons which we have already given for our conclusion, we cannot overlook the injustices which the proposed test would create in a case like this one. Petitioners apparently concede that Ford would be covered if his work were part of a continuous operation which began with the cargo's departure from a ship's hold. As respondents correctly point out, we are being asked to deny coverage purely because of a discontinuity in time created by the cargo's having been stored for a while along the shore. In contrast, under the test which we have adopted a shoreside worker like Ford would be covered if he was directly involved in "longshoring operations" such as unloading a ship. The work which Ford was performing was evidently an integral part of the process of moving maritime cargo from a ship to land transportation. Accordingly, we perceive an ample basis for the Board's determination that Ford was performing covered work, and we therefore affirm that decision.[24]
 
 
 29
 D. No. 75-2317. On July 30, 1973, John L. Nulty was employed as a carpenter at a shipyard in Moss Point, Mississippi. At the time of his injury, Nulty was building a piece of woodwork which was to be installed in a new ship that had been launched but not yet commissioned. The ship was berthed about 300 feet from the fabrication ship where Nulty was working. The part which Nulty was fabricating was designed to hold a spare wheel on board the new ship. Most of Nulty's work was performed in the shop, although at times he would go on board a vessel to take measurements, or to install or repair some woodwork. The parties agree that a fellow employee known as a "shipfitter" would have picked up and installed the item which Nulty was building when he was injured. Under these facts, the Administrative Law Judge and the Benefits Review Board found that Nulty was working as a "shipbuilder" at the time of his injury and thus satisfied Section 902(3)'s definition of covered work. In our view, the only reasonable conclusion is that Nulty was directly involved in an ongoing shipbuilding operation. Under the test which we have adopted, then, Nulty is entitled to compensation under the new Act. We accordingly affirm the Board's finding of coverage.
 
 
 30
 E. No. 75-4112. On May 2, 1973, Will Bryant was injured while working as a "cotton header" in a warehouse immediately adjacent to a pier in Galveston, Texas. At the port of Galveston, loads of cotton are first deposited at various shoreside warehouses by the inland shippers. The cotton is then placed upon dray wagons and taken to pier warehouses such as the one where Bryant was injured. The work performed by Bryant and other "cotton headers" is to unload the bales of cotton and stack them in pier warehouses. Two local unions, known to many as "cotton header's" and "longshoremen's" locals, have strictly divided waterfront operations between them. Generally, the cotton remains in these warehouses until other employees from the "longshoremen's" union take it on board ship. This storage period may last from less than one day to several weeks, although the average interval is about one week. At times, the cotton will be moved from one pier warehouse to another before being taken to a ship. In such cases, dray wagons are again used to carry the cotton, and "cotton headers" unload these wagons at the receiving warehouse. Occasionally, the cotton is moved directly from a dray wagon to a ship, in which event the work is performed solely by "longshoremen". The cotton which Bryant was handling at the time of his injury remained in the same warehouse for five days before "longshoremen" arrived to take the cargo aboard a vessel. On these facts, we affirm the Board's conclusion that the injury sustained by Bryant is within the Act's coverage. The situs was a pier-side warehouse in which cotton is stored temporarily before being taken on board ships. Usually, the cargo is taken directly from the warehouse to a ship. It is clear that Bryant was working on a waterfront area "customarily used by an employer in loading . . . a vessel", and that therefore the requirements of Section 903(a) are met. We also will not set aside the Board's determination that Bryant was performing the work of an "employee" as defined in Section 902(3). We have already noted the established principle of liberal construction of this Act, and the statutory presumption that a claim is within the Act's coverage. Also, we are bound to respect the Board's conclusions if they are supported by the record and if they have a reasonable legal basis. In view of the limited nature of our review, we cannot say that the Board erred in defining Bryant's work status. As we here reiterate, we reject the notion that a "point of rest" such as the pier-side warehouse in this case marks the division between covered and uncovered work. We have no doubt that Bryant would be directly involved in "longshoring operations" if, instead of setting the cargo down, he had handed it to a "longshoreman" for immediate loading on board a ship. The brief discontinuity in time created by the cotton's temporary storage did not alter the essential nature of Bryant's work, which was an integral part of the ongoing process of moving cargo between land transportation and a ship. Clearly, there is adequate support for a conclusion that Bryant was directly involved in "longshoring operations" and therefore falls within the terms of Section 902(3). Thus, we affirm the Board's decision that the injury in this case is covered by the new Act.[25]
 
 IV
 A CONSTITUTIONAL QUESTION
 
 31
 It is earnestly argued by Halter Marine Fabricators, Inc., and its insurance carrier that the new Act is unconstitutional insofar as it extends coverage to shipbuilding employees who are injured on land. We are reminded that traditionally a contract to build a ship has not been considered to be within the admiralty jurisdiction,[26] and that admiralty has traditionally included only those torts which occur upon the waters.[27] In the Halter Marine case, the employee was injured while working on land in furtherance of a shipbuilding operation. Therefore, we are told, Congress has exceeded the fixed boundaries of admiralty jurisdiction by covering work under a non-maritime contract which is performed on a situs outside the scope of traditional tort jurisdiction. In essence, the argument is that the sum of traditional admiralty tort and contract jurisdiction defines the absolute limits within which Congress may legislate under the Admiralty Clause.[28] We disagree with this proposition. No authority supports the notion that, in enacting a uniform compensation scheme for waterfront employees, Congress must find a "contract" or "tort" peg upon which to hang its legislation. The true analysis to be applied to such statutes is quite different. It must begin with the long-standing judicial recognition of Congress' broad powers to expand the reach of admiralty jurisdiction. Contrary to the impression created by petitioners' briefs, such judicially authorized expansion has often been geographical in nature. See, e. g., The Genesee Chief, 12 How. 443, 13 L.Ed. 1058 (1851), overruling The Thomas Jefferson, 10 Wheat. 428, 6 L.Ed. 358 (1825) (abandoning former limitation of admiralty jurisdiction to the tidewaters). The cases which approve the many changes which Congress has made in admiralty jurisdiction are replete with statements such as the following:
 
 
 32
 The authority of the Congress to enact legislation of this nature (the Ship Mortgage Act, 46 U.S.C. §§ 911 et seq.) was not limited by previous decisions as to the extent of the admiralty jurisdiction. We have had abundant reason to realize that our experience and new conditions give rise to new conceptions of maritime concerns. These may require that former criteria of jurisdiction be abandoned . . . Detroit Trust Co. v. The Thomas Barlum, 293 U.S. 21, 52, 55 S.Ct. 31, 41, 79 L.Ed. 176 (1934).
 
 
 33
 The Supreme Court has also consistently followed the view that this Congressional power "permits of the exercise of a wide discretion". Panama R.R. v. Johnson, 264 U.S. 375, 386, 44 S.Ct. 391, 394, 68 L.Ed. 748 (1924). Our conclusion is that, in the exercise of its discretion, Congress could properly determine that "new conceptions of maritime concerns" justified the extension of compensation coverage to workers in the immediate waterfront area who participate in an ongoing shipbuilding operation. As the legislative history makes clear, Congress was concerned that under the former Act maritime workers were covered over the waters but not covered while performing similar or related work on shore. The inequities of the pre-1972 Act in this regard are obvious, and we feel that this concern was a legitimate reason for Congress to exercise its discretion. We also feel that this concern was a "maritime" one within the meaning of the Admiralty Clause. We have already indicated that, in defining "maritime" concerns, we will not be limited by the rules which apply to tort and contract litigation. In the present case, we are not considering whether Congress would authorize suits upon shipbuilding contracts or whether land-based torts could be made actionable by an admiralty statute.[29] We deal only with the case before us, and in our view Congress could reasonably have felt that shipbuilding employees beside the navigable waters were performing a sufficiently maritime function to be covered by a revamped harbor workers' compensation statute. We therefore cannot conclude that Congress exceeded its broad discretion by extending coverage to such work.[30]
 
 V
 DIRECTOR A PROPER RESPONDENT
 
 34
 This issue is before the Court in rather an odd fashion. In their main brief on appeal, the Ayers Steamship petitioners allege that the Director of the Office of Workers' Compensation Programs, United States Department of Labor, is not a proper respondent in this Court, although he could appear as amicus curiae. We decline to consider the merits of this contention. First, we note that petitioners have never moved to dismiss the Director as a respondent. In our view, the relief which petitioners seek dismissal of the Director as a party and addition of him as amicus curiae is properly requested by a motion pursuant to Rule 27 of the Federal Rules of Appellate Procedure. Under that Rule, a motion is the appropriate vehicle for making "an application for an order or other relief", a category which clearly includes the request which petitioners have made for the first time in their brief. Furthermore, even assuming that petitioners have adequately raised this point, we cannot overlook the fact that in the two Jacksonville Shipyards cases another panel of this Court has granted motions by the Director to be added as a party respondent. These legal determinations that the Director may properly appear as a respondent must be respected by this Court. As a general rule, one panel cannot overrule the precedents set by another panel, absent some intervening factor such as a new controlling decision of the Supreme Court. See Davis v. Estelle, 529 F.2d 437, 441 (5th Cir. 1976). No such factor is present in this case, and we will therefore allow the Director to remain before this Court as a respondent.
 
 VI
 DUE PROCESS
 
 35
 In the Pfeiffer case, the Benefits Review Board awarded an attorney's fee to counsel for the successful claimant. The fee covered only the work which was performed before the Board, and the manner of its award was as follows. Pursuant to the applicable regulation,[31] counsel presented his request for an attorney's fee, supported by a complete statement of the services which had been performed. Finding a fee of $1,000 to be "fair and reasonable for the work done in connection with these appeals", the Board approved an award in that amount, remanding the case to the Administrative Law Judge for determination of a fee for counsel's services at that level. Petitioners opposed the award, arguing that counsel had not "properly proved" the reasonableness of the fee and that petitioners should have an opportunity to offer evidence and to cross-examine counsel on the amount of his fee. The evidentiary hearing which they requested was alleged to be a requirement of the Fifth Amendment's Due Process Clause. The board rejected these arguments, and so do we. Government officials are, of course, required to minimize the risks of error and unfairness in the procedures by which one is deprived of life, liberty, or property. See, e. g., Goss v. Lopez, 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); Mitchell v. W. T. Grant Co., 416 U.S. 600, 609-10, 618, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). We feel that these risks were adequately minimized by the procedures which the Board followed. The Board was clearly able to evaluate the services which counsel performed before it. It was the Board which read counsel's briefs and observed his representation of the claimant in the administrative appeal. Thus, the fee which the Board granted was carefully limited to those services of which it had first-hand knowledge. Especially in view of the extremely generalized nature of petitioners' attack upon the fee's reasonableness, we cannot say that disposing of petitioners' objections without an evidentiary hearing was a violation of the Due Process Clause.
 
 VII
 CONCLUSION
 
 36
 For the foregoing reasons, the decisions of the Benefits Review Board in Nos. 75-1659 and 75-2833 are REVERSED. The Board's decisions in Nos. 75-2289, 75-2317 and 75-4112 are AFFIRMED in all respects.
 
 
 
 *
 Judge Thornberry was a member of the panel that heard oral arguments but due to illness did not participate in this decision. 28 U.S.C. § 46(d) (1970)
 
 
 [1]
 Especially pertinent are new Sections 902(3) (definition of "employee"), 902(4) (definition of "employer"), and 903(a) (expanded situs provision in new Act). Despite the fact that more than three years have passed since the Amendment's effective date, litigation over the Act's new coverage is just now beginning to reach the courts. See Weyerhaeuser Co. v. Gilmore, 528 F.2d 957 (9th Cir. 1975). See also I. T. O. Corp. v. Benefits Review Bd., 529 F.2d 1080 (4th Cir. 1975), rehearing en banc granted (4th Cir. Mar. 12, 1976)
 
 
 [2]
 As shall appear infra, there is a dispute as to whether the Director is a proper party respondent in this Court, or whether his status is merely that of amicus curiae. In Part V of this opinion, we hold that the Director is a proper respondent
 
 
 [3]
 New Section 919(d) provides that evidentiary hearings shall be held before hearing examiners. The administrative regulations relating to the Amendments make it clear that such hearing examiners are to be Administrative Law Judges. See 20 C.F.R. § 702.332 (1975)
 
 
 [4]
 Pursuant to Section 921(b)(3) of the new Act, the Benefits Review Board is authorized to hear appeals by any party in interest from the Administrative Law Judge's orders. The Board must base its decision upon the hearing record and is bound by a "substantial evidence" standard in its review of findings of fact. Id
 
 
 [5]
 Jurisdiction over these appeals is conferred upon us by Section 921(c) of the new Act. Thereunder, a party aggrieved by a final order of the Board may obtain review of that order in the Court of Appeals for the federal judicial circuit in which the employee's injury occurred
 
 
 [6]
 See former 33 U.S.C. § 903(a). There were certain exemptions from coverage, all of which have been carried over into the new Act. See id., as amended, § 903(a)(1) (masters and crew members; persons engaged by masters to service vessels under eighteen tons net); id. § 903(a)(2) (government employees); id. § 903(b) injuries caused solely by the employee's intoxication or willful conduct)
 
 
 [7]
 Further underscoring the maritime context of these injuries was the fact that the injuries were caused by ships' cranes which had swung out of control. 396 U.S. at 213-14, 90 S.Ct. 347
 
 
 [8]
 See H.R. No. 92-1441, 1972 U.S.Code Congressional & Administrative News at 4707
 
 
 [9]
 None of the employers denies that it is an "employer" within the meaning of new Section 902(4):
 The term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).
 In any event, it is clear that this section requires merely that an employer have at least one employee engaged in "maritime employment" (the requirement of new Section 902(3)'s definition of an "employee") on the situs defined in new Section 903(a). Thus, if a claimant can satisfy Sections 902(3) and 903(a), his employer is automatically brought within Section 902(4).
 
 
 [10]
 Compare old 33 U.S.C. § 902(4) with new 33 U.S.C. § 902(4). As we have indicated, supra note 9, the only way to read the new Act consistently is to give the words "maritime employment" in new Section 902(4) the same meaning as in new Section 902(3)
 
 
 [11]
 Not only, as noted was the "water's edge" doctrine applied to the situs of the claimant's injury, but the "maritime employment" of the employer's workers was required to take place "upon the navigable waters of the United States (including any dry dock)". See old 33 U.S.C. § 902(4)
 
 
 [12]
 The commendable diligence of counsel has uncovered some scattered dicta which might be read as suggesting the general nature of "maritime" work. See, e. g., Pennsylvania R. R. v. O'Rourke, supra, 344 U.S. at 339-40, 73 S.Ct. 302. These occasional pronouncements by the courts have, at best, only the most tenuous connection with the 1972 Amendments' extension of coverage to shoreside injuries. In comparison with the statutory language itself and the legislative history, the timeworn dicta which are urged upon us are entitled to little weight. Also, we note that none of the instant appeals involves an injury which occurred over the waters. Therefore, we need not, and do not, decide if the new Act made any changes in the coverage of such injuries
 
 
 [13]
 33 U.S.C. § 902(3)
 
 
 [14]
 In light of the statutory language, we regard the omission of shipbreaking from this passage as inadvertent
 
 
 [15]
 "The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity." H.R.No.92-1441, 1972 U.S.Code Congressional & Administrative News, at 4708
 
 
 [16]
 For the same reason we also cannot accept the notion that the official name of an employee's union or the language of a union's jurisdictional agreement is dispositive of the issue of coverage. It is the employee's work at the time of the injury which controls
 
 
 [17]
 Id. (Emphasis supplied.) The same report also states that clerical employees who do not "participate in the loading or unloading of cargo" would not be covered by the new Act. Id
 
 
 [18]
 See Gorman, The Longshoremen's and Harbor Workers' Compensation Act After the 1972 Amendments, 6 Journal of Maritime Law and Commerce 1, 10 (1974). By this holding, we do not mean to suggest that future cases may not bring to light other types of covered work which cannot be characterized as loading, unloading, repairing, building, or breaking, and which are not "directly involved" with these five types of work, but which nevertheless are sufficiently similar to fall within the Congressional scheme. No such additional category of covered work appears in the cases before us, but we will not foreclose the possibility of such categories arising in future litigation
 
 
 [19]
 The Federal Maritime Commission has defined the "point of rest" as follows:
 For the purpose of this section, "point of rest" shall be defined as that area on the terminal facility which is assigned for the receipt of inbound cargo from the ship and from which inbound cargo may be delivered to the consignee, and that area which is assigned for the receipt of outbound cargo from shippers for vessel loading. 46 C.F.R. § 533.6(c) (1975).
 
 
 [20]
 A narrowly technical construction of the Longshoremen's and Harbor Workers' Compensation Act has traditionally been disfavored. See, e. g., Luckenbach S.S. Co. v. Norton, 106 F.2d 137, 138 (3d Cir. 1939)
 
 
 [21]
 In deciding how to interpret the Amendments and their legislative history, we have remembered that this Act is to be liberally construed in favor of injured employees. See Voris v. Eikel, 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953). In our view, this principle requires us to resolve doubts as to the new Act's coverage in favor of a particular group of workers such as cargo handlers landward of the "point of rest"
 Brief mention should also be made of the House Committee's announced intention "to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity", H.R.No.92-1441, supra, at 4708. We agree that here the Committee was speaking of one inequity of the old "water's edge" approach, under which cargo handlers would walk in and out of coverage as they moved between ship and shore. However, we see no reason to treat this statement as a comprehensive description of the new Act's coverage, with the result that only those workers who spend part of their days upon the waters would be covered. In this passage, the Committee was merely addressing itself to one anomaly which it wished to eliminate. The same paragraph clearly states that checkers would be covered by the new Act, and the Committee gave no indication that coverage would depend on whether the checkers went on board ship. The test, rather, was to be whether they were "directly involved in the loading or unloading functions". Id.
 
 
 [22]
 Although these cases were decided under the old Act, which provided for administrative adjudication by a deputy commissioner and for judicial review by a United States District Court, petitioners have offered no reason why the standard of review should be different under the present Act
 
 
 [23]
 The parties have stipulated that the nearest body of water was 500 yards away from the office
 
 
 [24]
 Petitioners' briefs are rich in references to the title of Ford's union (which was the "warehousemen's" rather than the "longshoremen's" union) and to the jurisdictional agreement between the two unions. As we have already indicated, we do not regard such matters as dispositive; instead, we look to the duties which a claimant was performing at the time of his injury
 
 
 [25]
 Once again, we refuse to base our decision upon the designations of the two waterfront unions as "cotton header's" and "longshoremen's" or upon the terms of their jurisdictional agreements. Compare note 24, supra
 
 
 [26]
 See, e. g., Thames Towboat Co. v. The Francis McDonald, 254 U.S. 242, 243, 41 S.Ct. 65, 65 L.Ed. 245 (1920)
 
 
 [27]
 See, e. g., Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972)
 
 
 [28]
 Art. III, Section 2 of the Constitution extends the federal judicial power "to all Cases of admiralty and maritime Jurisdiction . . ." This clause has always been construed as empowering Congress to legislate in maritime matters. See, e. g., Romero v. International Terminal Operating Co., 358 U.S. 354, 361, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959)
 
 
 [29]
 See 1A Benedict on Admiralty § 94, at 5-15 (6th ed. 1973)
 
 
 [30]
 Because of our disposition of this issue, we need not reach the question of whether the 1972 Amendments were an exercise of Congress' power under the Commerce Clause as well as under the Admiralty Clause
 
 
 [31]
 20 C.F.R. § 702.132 (1975). The statutory basis for this regulation is 33 U.S.C. §§ 928(a) & (c), as amended