**Dennis G. LYNN, Plaintiff,**

v.

**HEYL AND PATTERSON, INC., a Pennsylvania Corporation, Defendant.**

**Civ. A. No. 78–1365.**

United States District Court,
W. D. Pennsylvania.

Jan. 31, 1980.

Elmer S. Beatty, Jr., Doherty, Heck, Robb & Beatty, Pittsburgh, Pa., for plaintiff.

Anthony P. Picadio, Tucker, Arensberg, Very & Ferguson, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

COHILL, District Judge.

### Facts

Dennis G. Lynn, the plaintiff, has labored as an ironworker for thirty-five years. On or about November 25, 1975, Heyl and Patterson, Inc., the defendant, hired Mr. Lynn through a union hiring hall to work as a rigger at a construction site located on the Ohio River at Pennsylvania Power Company's Bruce Mansfield Plant. In general terms, a rigger is an ironworker who moves pieces of iron by using cables and clamps. Heyl and Patterson, Inc. had contracted with Pennsylvania Power Company to construct a barge haul system—a facility designed to unload raw materials from barges.

As part of the construction work, a truck had deposited several five-ton pontoons on the top of a steep embankment that overlooked the river. On December 2, 1975, the plaintiff was helping to move these pontoons down the embankment to a place within the operational radius of a crane that was located on a barge. The crane then would lift and position the pontoons.

The ironworker crew had succeeded in moving one of the pontoons within the radius of the crane. At about noon, the plaintiff was attaching cables to the pontoon. As part of this procedure, the crane operator began to lift the pontoon. Suddenly, the embankment on which Mr. Lynn was standing gave way. He tried to get the crane operator to rapidly lower the pontoon, but instead the operator quickly raised it. The plaintiff, clinging to one of the cables, was pulled off the ground; the pontoon and a wrecking ball that was attached to the rig were spinning out of control. The wrecking ball hit Mr. Lynn at least twice before the foreman got the crane operator to lower the pontoon and the plaintiff to the ground. Mr. Lynn sustained serious injuries in this accident.

In order to assist in the construction of the barge haul system, Heyl and Patterson, Inc. had leased a crane from Dravo Company. It mounted that crane on a barge that it had leased from McDonough Marine Company. An employee of the defendant operated the crane. Heyl and Patterson, Inc. also had contracted with Johnson Towing Company for a tugboat and crew to move the crane barge. A captain, a deckhand and a cook manned the tugboat.

In the days prior to the accident, the plaintiff had gone on board the barge numerous times. Mr. Lynn had assisted on several occasions in securing the barge next to the riverbank by using a sledgehammer to knock out a pin that restrains an anchorlike device. He also had helped to build a gangplank between the shore and the barge by laying down wooden boards. Moreover, Mr. Lynn had participated in attaching and detaching the barge and the tugboat through the use of a winch and cable. Finally, the plaintiff often had boarded the barge to coordinate his activities with the crane operator and to prepare the rigging on the crane.

Mr. Lynn also had travelled aboard the tugboat. On several occasions, the tugboat had transported the entire five-man ironworker crew over a three-quarter mile stretch of the Ohio River between the construction site and a loading ramp. The crew went to the ramp to pick up a twenty-ton piece of iron that was to serve as the keystone for the barge haul system. After a couple of test runs, the crew lashed the piece to the outside of the crane barge, and the tugboat pushed the load to the construction site. While on the tugboat, the plaintiff checked the depth of the channel with a bobber on two or three occasions. Mr. Lynn testified at his deposition that any available man, including ironworkers, would check the depth. He also signaled to the crane operator to lower the boom as the barge and tugboat approached a cable that spanned the river. On the day of the accident, Mr. Lynn arrived at the construction site by automobile and went aboard the tugboat only to help to detach the barge.

## Procedural History

Following the December 2, 1975 accident, Dennis Lynn applied for and began to receive Pennsylvania Workmen's Compensation benefits. On December 18, 1978, the Bureau of Workers' Compensation held a hearing to address a commutation petition that the claimant had filed. Although a referee granted the petition on March 26, 1979, and awarded plaintiff $109,030.58, the insurance carrier has appealed that order.

On December 1, 1978, exactly three years after the accident, Mr. Lynn filed a complaint in this Court against Heyl and Patterson, Inc. Although the complaint lacks clarity, we read it as asserting four claims. First, alleging seaman status, the plaintiff seeks to recover damages at law from his employer under the Jones Act, 46 U.S.C. § 688 (1976). Second, Mr. Lynn seeks the traditional seaman's remedy of maintenance and cure. Third, he advances a claim against his employer for statutory compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1976 & Supp.1977). Finally, he asserts a claim for the alleged unseaworthiness of the crane barge under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) (1976). The complaint, relying on the Jones Act, the Longshoremen's and Harbor Workers' Com-

pensation Act and "applicable maritime laws," invokes this Court's subject matter jurisdiction over admiralty cases. *See* 28 U.S.C. § 1333 (1976).

█ On February 16, 1979, the defendant filed a motion to dismiss the complaint. This Court subsequently granted a motion that delayed disposition of the motion to dismiss until the parties had an opportunity to take certain depositions. Now having received copies of these depositions, we will treat the defendant's motion as a motion for summary judgment. *See* Fed.R.Civ.P. 12(c). In determining whether a genuine issue as to a material fact exists, we must construe all pleadings in favor of the plaintiff. We may grant a motion for summary judgment only if there is no substantial evidence in support of the plaintiff's position, or if the supporting evidence is too incredible to be accepted by reasonable minds, or if the supporting evidence, even conceding its truth, lacks legal probative force. *Thibodaux v. Atlantic Richfield Co.,* 580 F.2d 841, 844 (5th Cir. 1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979).

### Jones Act

The plaintiff has asserted a claim under the Jones Act, 46 U.S.C. § 688 (1976), which provides in relevant part:

> Any seaman who shall suffer personal injury in the course of his employment may . . . maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply . . . .

Only a seaman may invoke the Jones Act. The pivotal question raised by the defendant's motion is whether, as a matter of law, Dennis Lynn does not qualify for seaman status.

Two Third Circuit opinions have extensively explored the elements that constitute seaman status. In *Griffith v. Wheeling-Pittsburgh Steel Corp.,* 521 F.2d 31 (3d Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976), the court identified three essential elements: The vessel connected with the injury must be in navigation; the injured worker must have a more or less permanent nexus with the vessel; and the worker must be aboard the vessel primarily to aid in navigation. 521 F.2d at 36. The court then applied these elements to the case before it.

The plaintiff in *Griffith* worked as a laborer at a Wheeling-Pittsburgh steel mill along the banks of the Monongahela River. He was assigned for four days to work at the company's barge landing. On the day of the accident, he was helping the barge crew to load two barges. In the course of the loading process, Griffith worked both on the seawall and on the barges. After the crew had finished with one barge, they moved the second barge into a position for loading; Griffith assisted by throwing lines from one barge to the other.

After the loading of the second barge had begun, the river foreman noticed that the barge covers were difficult to move because of rust and corrosion. He ordered the crew to halt the loading and to close the covers. In order to close one cover the crew attached to it a cable from a crane. Griffith and another workman were standing on the cover when the crane operator applied tension. As the stuck cover began to rise, the men stepped on to an adjacent cover. The second cover suddenly rolled backward, however, and the two men fell into the hold.

Although the barge had not been moving at the time of the accident, the court found that the "in navigation" requirement was satisfied. According to the court, "in navigation" simply means that "the vessel is engaged as an instrument of commerce or transportation on navigable waters." 521 F.2d at 37.

The plaintiff was not as fortunate on the second hurdle, however. The Third Circuit held that someone who loaded barges on a temporary basis—four days in *Griffith*—did not have a sufficiently permanent connection with a vessel or vessels. The

court stated that such a "temporary relationship, cannot as a matter of law, give rise to seaman status." *Id.*

Turning to the final essential element, the Third Circuit held that the plaintiff had not been aboard the barge primarily to aid in navigation. Finding that Griffith had performed only an insignificant navigational function by helping to move the second barge into a loading position, the court concluded that "[a] worker upon a barge whose primary duties involve the handling of cargo rather than the carrying out of required navigational responsibilities is a longshoreman rather than a seaman." *Id.* Although Griffith sustained his injury while he was on the barge, the court noted that he was not performing a navigational function at the time of the accident. *Id.* at 38.

Recently, the Third Circuit again reviewed the coverage of the Jones Act. The case, *Simko v. C & C Marine Maintenance Co.,* 594 F.2d 960 (3d Cir. 1979), arose from an accident in which John Simko drowned. At the time of his death, Simko was employed as a laborer at the defendant's barge facility along the Ohio River. His duties included shoveling out debris from the holds of the barges, hosing down their decks, and carrying pumps and other equipment used in the cleaning operations. On March 11, 1972, while pulling on a water hose, the decedent slipped and fell overboard. The swift current swept him underneath another barge before his co-workers could throw him a lifeline.

The trial court submitted the Jones Act claim, *inter alia,* to the jury, and the jury returned a general verdict for the plaintiff. The Third Circuit vacated the subsequent judgment and remanded, holding that the trial court had erred when it denied the defendant's motion for a directed verdict on the Jones Act claim. Basing its decision on the third essential element of seaman status, the Third Circuit determined that "the evidence introduced at trial could not support a jury finding that Simko was aboard [the] barge primarily to aid in its navigation." 594 F.2d at 964. Rather, the court concluded that "Simko's primary duties involved the work of a harbor worker." *Id.* It then reaffirmed the principle established in *Griffith* "that a maritime worker who does not actually go to sea but who is injured while performing duties on a navigable vessel must establish that he performed significant navigational functions with respect to that vessel in order to recover under the Jones Act." *Id.* at 965.

■ Under the interpretation of the term "seaman" set forth in *Griffith* and *Simko,* Dennis Lynn cannot qualify for Jones Act coverage. The plaintiff lacked a permanent connection with a vessel. He earned his living as an ironworker, obtaining specific jobs through a union hiring hall. Heyl and Patterson, Inc. hired him for a construction project that was to have lasted approximately one month. After the completion of the barge haul system, Mr. Lynn would have moved on to another job that could well have been unrelated to navigable water. Thus, he and Griffith were similarly situated; both worked at the water's edge on a temporary basis.

■ The plaintiff's Jones Act claim also runs aground on the third element of seaman status because he was not on board any vessel primarily to aid in its navigation. As a rigger, Mr. Lynn's primary responsibilities involved the movement and positioning of the various components of the barge haul system. The majority of these components arrived by truck and Mr. Lynn sustained his injury while on land helping to move one of the components down an embankment. Both Griffith and Simko had, perhaps, stronger cases on this point because their accidents occurred while they were working on barges. Moreover, their injuries arose from barge-related tasks—closing a barge cover and performing maintenance on a barge.

Any work that Mr. Lynn performed on the barge and tugboat was ancillary to his land-based tasks. The presence of a barge and a tugboat at the job site resulted from considerations of convenience. A crane mounted at water's edge provided more flexibility than one mounted on top of the embankment; a tugboat could more easily

move the twenty-ton component into position than could a truck.

The bulk of Mr. Lynn's work aboard the barge involved coordinating his activities with the crane operator and preparing the crane to raise the iron components. This work did not affect in any way the navigation of the vessel. Laying boards to create a gangplank for the barge likewise did not involve navigation. Those activities that could be characterized as navigational in nature—knocking out the restraining pins on the barge's anchoring devices, attaching and detaching the barge from the tugboat, checking the depth of the channel on two or three occasions, and signalling to the crane operator to lower the boom—constituted an insignificant portion of the plaintiff's daily work. Moreover, Mr. Lynn performed some of these tasks voluntarily. The tugboat had both a captain and a deckhand. Johnson Towing Company had not hired the plaintiff to do any work on the vessel, and he was not under the command of the captain. The ironworker crew boarded the tugboat solely for transportation. During those trips, a few simple jobs were performed by any available man. Voluntarily participating in such activities did not make the plaintiff a seaman. *See Klarman v. Santini,* 503 F.2d 29, 33 (2d Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 785, 42 L.Ed.2d 807 (1975) (auxiliary policeman on board police patrol vessel as observer denied seaman status even though injured while helping to free sloop that had run aground).

### Maintenance and Cure

Admiralty courts have long recognized a seaman's right to receive maintenance and cure from his employer for injuries sustained in the service of a vessel. This remedy covers only seamen, however, and not longshoremen or others working in a harbor area. *See* 1B *Benedict on Admiralty* § 44, at 4–11 (7th ed. rev. 1976); G. Gilmore & C. Black, *The Law of Admiralty* § 6–7, at 282 (2d ed. 1975). This Court's finding that Dennis Lynn does not qualify for seaman status under the Jones Act likewise precludes him from pursuing a claim for maintenance and cure.

### Longshoremen's Benefits

Through the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1976 & Supp.1977) [hereinafter referred to as the "LHWCA"], Congress sought to provide adequate financial security for persons who sustain injuries while engaged in maritime employment. *See* H.R.Rep.No. 92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] *U. S. Code Cong. & Admin. News,* pp. 4698, 4698–99. The LHWCA establishes a detailed schedule of benefits for injured workers and the families of deceased workers. *See* 33 U.S.C. §§ 906–910 (1976). Section 4 of the LHWCA, 33 U.S.C. § 904 (1976), imposes liability for compensation benefits on the injured worker's employer, "irrespective of fault as a cause for the injury."

The statute also establishes a procedure for obtaining a compensation award. Employees initially must file a claim for benefits with the deputy commissioner, Office of Workers' Compensation Programs, United States Department of Labor, for the district in which the injury occurs. LHWCA § 13, 33 U.S.C. § 913 (1976). Upon the application of any interested party, the deputy commissioner refers the case to an administrative law judge, who conducts a hearing and enters an order. LHWCA § 19, 33 U.S.C. § 919 (1976). An adversely affected party may appeal this order first to the Benefits Review Board, United States Department of Labor, and then to the United States Court of Appeals. LHWCA § 21, 33 U.S.C. § 921 (1976). Congress did not give the United States District Courts a role in the adjudication of compensation claims. *See, e. g., Jacksonville Shipyards, Inc. v. Perdue,* 539 F.2d 533, 537 (5th Cir. 1976), *vacated,* 433 U.S. 904, 97 S.Ct. 2967, 53 L.Ed.2d 1088 (1977), *on remand,* 575 F.2d 79 (5th Cir. 1978). Thus, we have no jurisdiction to hear the plaintiff's claim for compensation under the Longshoremen's and Harbor Workers' Compensation Act.

### Unseaworthiness

The complaint asserts a claim for damages arising from the alleged unsea-

worthiness of the crane barge that the defendant had leased from McDonough Marine Company. The plaintiff cannot obtain relief on such a claim. Section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) (1976), provides that "[t]he liability of the vessel . . . shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred." *See Simko v. C & C Marine Maintenance Co.,* 594 F.2d 960, 962 n.1 (3d Cir. 1979). Although abolishing the doctrine of unseaworthiness, Congress did furnish maritime workers with a right of action against vessels. Section 5(b) also states that "[i]n the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . and the employer shall not be liable to the vessel for such damages directly or indirectly . . . ." *See generally* H.R.Rep.No. 92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] *U. S. Code Cong. & Admin. News,* pp. 4698, 4703–04. Section 2(21) of the LHWCA, 33 U.S.C. § 902(21) (1976), defines "vessel" as "any vessel . . . and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." Heyl and Patterson, Inc. had exclusive possession and control of the crane barge, and therefore, it was the owner pro hac vice of that vessel. *See Griffith v. Wheeling-Pittsburgh Steel Corp.,* 610 F.2d 116 (3d Cir. 1979); *Blair v. United States Steel Corp.,* 444 F.2d 1390 (3d Cir. 1971), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 681, 30 L.Ed.2d 666 (1972). In *Griffith v. Wheeling-Pittsburgh Steel Corp.,* 521 F.2d 31, 40–44 (3d Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976), the Third Circuit held that an injured employee may sue a vessel for negligence under section 5(b) even though his employer is the owner pro hac vice of that vessel. Mr. Lynn's complaint contains allegations of negligence concerning the condition of the crane barge, so we will interpret the claim of unseaworthiness as a negligence claim. *See* Fed.R.Civ.P. 8(f).

Although section 5(b) of the LHWCA permits some injured persons to file suit against vessels, it explicitly limits the availability of this right of action to "person[s] covered under" the Longshoremen's and Harbor Workers' Compensation Act. Coverage extends only to persons who meet both a situs and a status requirement. *See Northeast Marine Terminal Co., Inc. v. Caputo,* 432 U.S. 249, 264–81, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). The situs test is satisfied if the injury occurred on "the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)." LHWCA § 3(a), 33 U.S.C. § 903(a) (1976). The status requirement focuses on the type of work that the person was performing when the injury occurred. *See P. C. Pfeiffer Company, Inc. v. Ford,* —— U.S. ——, ——, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979). The statute's umbrella protects only those "engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker." LHWCA § 2(3), 33 U.S.C. § 902(3) (1976).

■ Mr. Lynn can successfully navigate past the situs obstacle. He sustained his injury on an embankment that adjoined the Ohio River while constructing a barge haul system. Once complete, this system would be used to unload barges. We find that the work site had a sufficient nexus with maritime operations to come within the scope of the admiralty jurisdiction of the United States and the coverage of the LHWCA.

■ The plaintiff's claim founders, however, on the status requirement. A person qualifies for coverage only if he was engaged in "maritime employment" at the time that the accident occurred. *See* Note, *Shoreside Coverage Under the Longshoremen's And Harbor Workers' Compensation Act,* 18 B.C.Ind. & Com.L.Rev. 135, 159 (1976). For example, in *Jacksonville Ship-*

*yards, Inc. v. Perdue,* 539 F.2d 533 (5th Cir. 1976), *vacated,* 433 U.S. 904, 97 S.Ct. 2967, 53 L.Ed.2d 1088 (1977), *on remand,* 575 F.2d 79 (5th Cir. 1978), the Fifth Circuit deprived a welder of coverage even though he normally did ship repair work. On the day of the accident, his employer sent him to an unused marine facility within the shipyard to assist in tearing down a building. During the demolition work, the welder was struck in the head by steel fragments from a falling beam. The Benefits Review Board held that the LHWCA did cover this employee. 539 F.2d at 537. The Fifth Circuit reversed, concluding:

> Under no reasonable view was Skipper performing ship repair work at the time of his injury, nor was he carrying out any other of the types of work which the statute specifies as "maritime employment." We further hold that this salvage gang was not engaged in any work sufficiently similar to the statutory categories to be seen as a type of shoreside employment which was fairly within Congress' intent despite not being named in the 1972 Amendments. As we have already indicated, we refuse to attach controlling weight to an employee's regular job classification. . . . We look only to his duties at the time of the injury, and these were decidedly not within the contemplation of the statute.

*Id.* at 542. *Accord, Sea-Land Serv. v. Director, Office of Workers' Compensation Programs,* 540 F.2d 629, 639–40 (3d Cir. 1976) (remand to develop evidence bearing upon specific function of employee at time of accident).

Even if an accident befalls a workman while he is on navigable waters, he will not necessarily come within the scope of the LHWCA. In *Thibodaux v. Atlantic Richfield Co.,* 580 F.2d 841 (5th Cir. 1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979), for example, the Fifth Circuit would not permit the estate of a construction and maintenance worker to seek relief under the LHWCA even though the worker had drowned when the boat carrying him to his job site sank. Atlantic Richfield had assigned the decedent and three others to perform maintenance work on pipelines at one of its oilfields. This facility was accessible only by water. The company also had ordered the maintenance crew to place a pollution pan on a barge that had sunk in a canal near the oilfield. The vessel carrying the crew sank soon after leaving its launching point.

For purposes of reviewing the grant of defendant's motion for summary judgment, the Fifth Circuit assumed that the decedent often travelled to job sites by water, that he had helped to launch the transport vessel, that he had loaded equipment into the vessel, and that he was to participate in the installation of the pollution pan. 580 F.2d at 844–45 & n.9. Despite these connections with the navigable waters, the court found that

> [t]he record overwhelmingly establishes that the occupation of the deceased was that of an oilfield construction and maintenance man. The deceased simply is not the amphibious worker sought to be protected by the 1972 amendments to the LHWCA because his work was performed on land. The locality of the work sites fortuitously rendered it necessary to travel over water.
>
> . . . The deceased was not loading or unloading the vessel when it sank and the mere fact that on this one isolated occasion the vessel was to stop and a pollution pan was to be placed on a sunken barge does not operate to automatically convert the deceased into a maritime employee covered by the Act.

*Id.* at 845.

The Ninth Circuit in *Weyerhaeuser Company v. Gilmore,* 528 F.2d 957 (9th Cir. 1975), *cert. denied,* 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976), relied on similar analysis to address a claim presented by a sawmill pondman. Pondmen work on log jams, sorting the logs and feeding them into the mill for processing. The claimant had sustained his injury "when he fell from a floating walkway." 528 F.2d at 958. His sawmill was located on a salt-water bay of the Pacific Ocean.

The administrative law judge had rejected the pondman's claim, finding that the "claimant was a mill worker. The navigable water [the log pond] was used as an easy means to transport logs from point to point in the manufacturing process and had no close relationship to any maritime activity . . . ."

*Id.* at 961. The Benefits Review Board reversed, but the court of appeals subsequently upheld the administrative law judge's decision. The Ninth Circuit concluded

that to be entitled to the benefits of LHCA, an employee's employment must have a realistic relationship to the traditional work and duties of a ship's service employment. Otherwise the clear and unambiguous congressional language of "maritime employment" is nullified and rendered to read "any employment."

We hold that for an injured employee to be eligible for federal compensation under LHCA, his own work and employment, as distinguished from his employer's diversified operations, including maritime, must have a realistically significant relationship to "traditional maritime activity involving navigation and commerce on navigable waters," with the further condition that the injury producing the disability occurred on navigable waters or adjoining areas as defined in § 903.

528 F.2d at 961. *Accord, Conti v. Norfolk & W. Ry. Co.,* 566 F.2d 890, 895 (4th Cir. 1977). Moreover, the *Gilmore* court stated that it did not

believe that a bay side . . . situs of a sawmill with its partitioned salt water log pond in any fashion changes the universal and customary nature of the pondman's work and *ipso facto* engages him in "maritime employment." Just as it was at the upland sawmill, there is still a total absence of any realistically substantial relationship of the pondman's work and duties at the bayside sawmill log pond to navigation or commerce upon navigable waters.

528 F.2d 962.

The results in *Jacksonville Shipyards, Thibodaux* and *Gilmore* all implement the intent of Congress, as expressed in committee reports. In 1972, when Congress enacted significant amendments to the LHWCA, the House Committee on Education and Labor stated that it

believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. . . .

The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. . . . The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity.

H.R.Rep.No. 92–1441, 92d Cong. 2d Sess., *reprinted in* [1972] *U. S. Code Cong. & Admin. News,* pp. 4698, 4708.

Applying this legislative history and case law to the present action, we must conclude that Mr. Lynn may not assert a negligence claim under section 5(b) of the LHWCA. Mr. Lynn has worked for thirty-five years as an ironworker. This trade does not require him to load, repair or build navigable vessels. He was injured on land while participating in a construction project. *Jacksonville Shipyards, Inc. v. Perdue, supra,* stands for the proposition that such work has no significant relationship to traditional maritime employment. Although Mr. Lynn occasionally was transported aboard a barge and tugboat during the course of his employment, this merely reflects the fortuitous location of the construction site. *See Thibodaux v. Atlantic Richfield Co., supra,* at 845. Therefore, we hold that the plaintiff was not engaged in maritime employment at the time that he sustained his injury.

*Conclusion*

We have held that Mr. Lynn may not assert a claim under the Jones Act nor a claim for maintenance and cure because he

does not qualify as a seaman. Additionally, we have found that we lack jurisdiction over the plaintiff's claim for compensation under the LHWCA. Finally, we have concluded that Mr. Lynn may not invoke section 5(b) of the LHWCA, 33 U.S.C. § 905(b) (1976), because he was not engaged in maritime employment at the time of the accident.

Having held that the plaintiff may not obtain relief in federal court on any of the four claims that he asserts, we will grant the defendant's motion for summary judgment and dismiss the case. An appropriate order will follow.