631 F.2d 1214
 TROTTI & THOMPSON and Insurance Company of North America, Petitioners,
v.
Lowell P. CRAWFORD and Director, Office of Workers'
Compensation Programs, United States Department of
Labor, Respondents.
 No. 79-1793
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 4, 1980.
 Mehaffy, Weber, Keith & Gonsoulin, Daniel V. Flatten, Beaumont, Tex., for petitioners.
 Walter Umphrey, Port Arthur, Tex., for Lowell P. Crawford.
 Gilbert T. Renaut, U.S. Dept. of Labor, Washington, D.C., for Dept. of Labor.
 Petition for Review of an Order of the Benefits Review Board.
 Before BROWN, KRAVITCH and FRANK M. JOHNSON, Jr., Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 This is one of a spring tide of appeals resulting from the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA or Act), 33 U.S.C.A. §§ 901 et seq. The employer, Trotti & Thompson, Inc., and its workmen's compensation insurance carrier, Insurance Company of North America, appeal from a decision by the Benefits Review Board (BRB) awarding benefits to Lowell P. Crawford, a carpenter injured while building a pier at the Port of Beaumont, Texas. We affirm.
 
 
 2
 I. What Happened?
 
 
 3
 Crawford was a carpenter for Trotti & Thompson from 1958 to 1973. During that time he worked intermittently on the construction of highways, bridges, refineries, and a number of piers. For approximately six months prior to his injury, Crawford was involved in the construction of a large pier within the Port of Beaumont, extending into the Neches River, a major navigational waterway. The new pier was to become a part of the Port and to be used in the loading and unloading of vessels.
 
 
 4
 The pier-construction process is well-known.[1] As the record in this case shows, in the early stages the vast majority of the work takes place on floating barges. First, numerous pilings are driven into the bottom of the waterway. Support hangers are attached to the tops of the pilings. Progressing outward from the shore, the pilings are initially connected with narrow steel beams.[2] Wooden forms-built by carpenters on the floating barges-are then hoisted onto these strut beams and filled with concrete. Crawford, as most carpenters, was primarily involved in building the forms, although he also assisted in the hoisting and concrete-pouring operations. Not infrequently, in hoisting and in moving the barges from place to place, Crawford donned a life jacket and worked in the water itself. In all, about 90% of his time was spent working on the barges; the rest was either on the pier structure or actually floating in water itself.
 
 
 5
 Crawford's injury occurred as he was standing out over the water on one of the steel beams of the pier structure. He was directing a crane operator in the movement of a steel beam when the beam slipped out of the chain holding it. The beam struck Crawford, knocking him onto a concreted portion of the uncompleted pier and severely injuring his right arm.
 
 
 6
 The issues before us relate solely to whether Crawford was within the jurisdictional confines of the LHWCA at the time of injury. First, Crawford must have been working on a covered maritime situs[3] within § 903(a). Secondly, he must have had the status[4] of a covered employee under § 902(3).[5] Our resolution of these issues is aided by the decision of the Fourth Circuit in a factually similar case, Brown & Root, Inc. v. Joyner, 607 F.2d 1087 (1979), cert. denied, --- U.S. ----, 100 S.Ct. 2960, 64 L.Ed.2d 837 (1980), by a recent decision of the Supreme Court, P.C. Pfeiffer Co. v. Ford, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225, 1979 A.M.C. 2319 (1979), and by extensive discussions in decisions of our Court. See Jacksonville Shipyards, Inc. v. Perdue, 539 F.2d 533, 1976 A.M.C. 1934 (5th Cir. 1976), vacated and remanded in part, 432 U.S. 904, 97 S.Ct. 2967, 53 L.Ed.2d 1088, aff'd on remand, 575 F.2d 79, 1978 A.M.C. 2672 (1978), aff'd in part sub nom., P.C. Pfeiffer Co. v. Ford, supra; Ingalls Shipbuilding Corp. v. Morgan, 551 F.2d 61, 1977 A.M.C. 987 (5th Cir. 1977); Alabama Dry Dock & Shipbuilding Co. v. Kininess, 554 F.2d 176, 1977 A.M.C. 1650 (5th Cir.), cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190, 1978 A.M.C. 1894 (1977); Odom Construction Co. v. United States Department of Labor, 622 F.2d 110 (5th Cir. 1980).
 
 II. Situs
 
 7
 The pre-1972 LHWCA did not require that an injured employee have a maritime status. Instead, the primary requirement was that the injury have occurred "upon the navigable waters of the United States (including any dry dock)...." LHWCA of 1927, ch. 509, § 3(a), 44 Stat. 1426. This situs requirement was interpreted to incorporate the boundary line laid down in Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). The Jensen line ran along the water's edge, but also extended out along the edge of structures such as piers, which were over navigable waters but permanently attached to the land. Thus Nacirema Operating Co. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371, 1969 A.M.C. 1967 (1969), held that an injury occurring on a pier attached to the land-hence on the landward side of the Jensen line-was not covered by the pre-1972 Act. However, an employee knocked off the pier and injured when he hit the water was covered, since the injury was consumated on the seaward side of the Jensen line. See id. at 225, 90 S.Ct. at 355, 24 L.Ed.2d at 381, 1969 A.M.C. at 1976 (Douglass, J., dissenting) (discussing Marine Stevedoring Corp. v. Oosting, 238 F.Supp. 78 (E.D.Va.1965), aff'd, 398 F.2d 900 (4th Cir. 1968)). The Supreme Court decried the anomaly[6] in coverage of the pre-1972 Act, but stated that the remedy was up to Congress. Id. at 223-24, 90 S.Ct. at 353-54, 24 L.Ed.2d at 380, 1969 A.M.C. at 1976.
 
 
 8
 Despite the fact that Crawford spent at least 90% of his time seaward of the Jensen line, the portion of the uncompleted pier upon which he was standing and onto which he fell when injured was apparently[7] attached to the land. Thus Crawford would not have met the situs requirement of the pre-1972 Act. Crawford's temporary presence on the uncompleted pier-even though he normally spent more than 90% of his time on barges or in the water-would have deprived him of coverage under the pre-1972 Act.
 
 
 9
 In 1972, Congress amended the Act to, among other things, reduce the anomalies by moving the Act's coverage considerably inland. This was done with specific thought to longshoremen who constantly walked and worked across the Jensen line while loading and unloading docked vessels. P.C. Pfeiffer Co. v. Ford, supra. In order to reduce the anomalies of shifting coverage, Congress added a list of areas to the "navigable waters ... (including any dry dock) ..." provision. As broadened, the situs requirement now covers any injury
 
 
 10
 occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).
 
 
 11
 33 U.S.C.A. § 903(a) (note 3, supra). Thus piers and wharves have joined dry docks (and by implication marine railways) as landward expansions of the Act's coverage.
 
 
 12
 The employer-insurer appellants agree that a completed pier is covered by the express language of the amended situs requirement, but argue that an uncompleted pier is not covered. They argue that the word "pier" must be construed in the same fashion as the later words "or other adjoining area customarily used by an employer in loading, offloading, repairing, or building a vessel." They argue that an uncompleted pier cannot be "customarily used."[8] In support of this interpretation, appellants rely on our decision in Jacksonville Shipyards, Inc. v. Perdue, supra (Skipper's case.)[9]
 
 
 13
 In Skipper's case, we considered whether a "terminal"-a specifically listed area, like a "pier"-was a covered situs. Skipper was injured in an area across the river from an active shipyard, an area which had not been used, however, for maritime fabrication for about one year. We found that such an abandoned area was not a covered situs.[10] We did not, however, have occasion to consider an area under construction, which was intended for future maritime use. Nor did Skipper's case involve a situs such as a pier, being built over a clearly covered situs such as the navigable waters.[11]
 
 
 14
 Notwithstanding some broad dictum concerning future use in Perdue, we feel that there is a distinction between an area which before construction is a covered situs but is in the process of being put to some future use which will also qualify as a covered situs, and an area which was once a covered situs but is now abandoned, with no plans for future use as a covered situs. Perdue involved only this latter type of area-the separate fabrication facility in which Skipper was injured. That separate, abandoned area is far different from the construction area of the pier or dry dock at an already covered situs on the navigable waters. The construction area of a pier or dry dock is after all simply being transformed from one defined maritime use to another.
 
 
 15
 Precedent from the pre-1972 Act involving dry docks, and a recent application by the Fourth Circuit under the amended Act supports our approach. In Travelers Insurance Co. v. McManigal, 139 F.2d 949, 1944 A.M.C. 377 (4th Cir. 1944), a carpenter was injured while constructing a dry dock, a situs, once completed, specifically listed by the pre-1972 Act. The construction site had previously been covered with water, making it a previously covered situs.[12] The Court looked to the maritime function which the completed dry dock would fulfill and to the fact that the area in which the dry dock was being built had previously been a situs within the Act. The Court held: "It is not material that in the pending case the dry dock was not finished. Not only was the locality within the maritime jurisdiction, but the work was maritime in its nature." 139 F.2d at 952, 1944 A.M.C. at 383 (emphasis supplied). Thus the carpenter was awarded benefits. See also Travelers Insurance Co. v. Branham, 136 F.2d 873, 1943 A.M.C. 1419 (4th Cir. 1943).
 
 
 16
 The Fourth Circuit recently applied this precedent to a factually identical case under the amended 1972 Act. In Brown & Root v. Joyner, supra, the Court held that the amended Act essentially incorporated the pre-1972 interpretation of such drydock areas under construction:
 
 
 17
 The Board also correctly ruled that the claimants satisfied the situs test. Both Stewart and Joyner worked on various projects on the shipyard construction site after the water was pumped out and retained by bulkheads. Previously we have held that the site of a dry dock, which was formerly navigable water and would be used against (sic) in support of navigation, remained a part of the navigable waters of the United States during construction of the dock. See Travelers Insurance Co. v. McManigal, 139 F.2d 949, 952 (4th Cir. 1944). Our opinion was premised in part on the concept, expressed in The Raithmoor, 241 U.S. 166, 175, 36 S.Ct. 514, 60 L.Ed. 937 (1916), that an aid to navigation, though under construction, is of sufficient maritime import to sustain admiralty jurisdiction. Consequently, the dry dock, though under construction, was considered a part of the navigable waters of the United States even before the amendment to 33 U.S.C. § 903(a). The 1972 amendment did not change this interpretation of the Act.
 
 
 18
 607 F.2d at 1090 (emphasis supplied).
 
 
 19
 We agree with the Fourth Circuit's recent position. Congress now expressly prescribes that situs is satisfied for injuries occurring upon any pier adjoining navigable waters. And where pre-1972 injuries have been held covered, where occurring during the construction of a dry dock, a pier now being a covered situs the same rule should apply during its construction. Both are sites carved out of a clearly covered situs-the navigable water. Although we minimize their importance, both are aids to maritime commerce and are used in support of navigation even though the analogy to traditional aids to navigation is a little farfetched.[13] That a pier is now a part of the same parenthetical list in which prior to 1972 only a dry dock appeared, is further evidence that Congress expected an uncompleted pier to be treated like an uncompleted dry dock. Cf. Burnet v. Harmel, 287 U.S. 103, 108, 53 S.Ct. 74, 76, 77 L.Ed. 199, 203 (1932) (construing congressional intent). In sum, we hold that under the amended Act an uncompleted pier, under active construction, is a covered situs.
 
 III. Status
 
 20
 While Congress broadened the situs requirement of the LHWCA in 1972, it also added the positive requirement that an injured employee have been engaged in "maritime employment," pursuant to § 2(3) of the 1972 Act, 33 U.S.C.A. § 902(3) (note 4, supra). This status requirement extends coverage under the Act only to "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor worker including a ship repairman, shipbuilder, and shipbreaker...." Id. (note 4, supra).
 
 
 21
 In P.C. Pfeiffer Co. v. Ford, supra, the Supreme Court resolved two issues concerning the status requirement which are relevant to this appeal. First, the Court held that the amended Act did not necessarily cover all employees who, prior to 1972, would have walked in and out of coverage (across the Jensen line) during any given day. The status requirement was held to embody "an occupational rather than a geographic concept...." 444 U.S. at 78, 100 S.Ct. at 335, 62 L.Ed.2d at 234,[14] 1979 A.M.C. at 2330. Second, the Act's specific coverage of longshoremen, harbor workers, etc., was held to comprise only "a part of the larger group of activities that make up 'maritime employment' ...," id. at 77 n.7, 100 S.Ct. at 334 n.7, 62 L.Ed.2d at 233 n.7, 1979 A.M.C. at 2325 n.7. The status requirement therefore extends coverage to occupations beyond those specifically named by the statute. See Odom Construction Co. v. United States Department of Labor, supra.
 
 
 22
 Beyond those general principles, however, Pfeiffer does not itself resolve the instant appeal. Fortunately, two of our decisions do go a great way towards that end. The first, Alabama Dry Dock & Shipbuilding Co. v. Kininess, supra, is factually analogous. There, the shipbuilding company had purchased a disassembled crane. The crane, like a new dock under construction, had not been put to use by the company. Kininess was injured while he was sandblasting the parts of the crane as part of the crane assembly process. We first held that the employee's status was determined by whether his work directly furthered the shipbuilding goals of his employer. In the case at hand, Crawford's work undeniably furthered a similar goal of the Port of Beaumont: loading and unloading vessels. We secondly held in Kininess that initial construction was no different under the LHWCA than repair work:
 
 
 23
 ... coverage under the Act should not depend on whether the crane was in actual operation when Kininess was injured.... Repair and maintenance of machines used in shipbuilding is an essential aspect of the business.... While a distinction might be drawn between a crane being held in storage pending use and an active crane disassembled for repair, the policy of liberal construction indicates that such fine lines are inappropriate when determining coverage under the Act.
 
 
 24
 554 F.2d at 178, 1977 A.M.C. at 1652 (citations omitted). See also Ingalls Shipbuilding Corp. v. Morgan, supra (no distinction between repair and construction); Newport News Shipbuilding & Dry Dock Co. v. Graham, 573 F.2d 167, 170, 1979 A.M.C. 99, 103 (4th Cir.), cert. denied, 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978). Again, the instant case analogously involves initial construction rather than repair of an existing dock. Thus the assembly work in Kininess was held within the status requirement of the Act.[15]
 
 
 25
 Our very recent decision in Odom Construction Co. v. United States Department of Labor, supra, reinforces the teachings of Kininess. There, large concrete blocks which had been used for mooring barges and other vessels had slipped from the bank into a waterway. Odom Construction Co. was hired to move the blocks back ashore. One of the company's employees, Maze, was assigned to the job. Maze was usually a land-based construction worker and was not a part of the company's maritime construction group. The company made two status arguments on appeal. First, it argued that moving the blocks was not maritime work and so was not covered by the Act. We held that the work was maritime, however, because (i) maritime commerce was furthered by replacing the blocks, which could then be used to tie up barges, for loading and unloading purposes, and (ii) the restoration of such a facility was traditionally regarded as a maritime activity rather than as one only "peripherally" related to maritime matters.
 
 
 26
 The second status argument presented was that Maze was normally a land-based construction worker and the status requirement was not met since his usual work was nonmaritime. Based on Thibodaux v. Atlantic Richfield Co., 580 F.2d 841, 1979 A.M.C. 1794 (5th Cir. 1978) (dual test of either moment of injury or overall occupation), cert. denied, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979), we expressed doubt that anything beyond Maze's job activities at the time of injury needed to be considered. Nonetheless, we proceeded to consider the overall circumstances of Maze's employment. We decided that the status requirement encompassed more than the particular employee's assignment. The employer's overall assignment activities had to be considered. Thus we stated that Congress did not intend the status requirement of the Act to allow employers to escape liability "simply by allowing each employee to do only a limited amount of maritime work." 622 F.2d at 114.
 
 
 27
 The arguments presented here by the employer-insurer concerning Crawford's status are completely answered by these decisions. Any distinction between initial construction of a pier and repair of a pier is irrelevant under Kininess and Ingalls Shipbuilding Corp. v. Morgan, supra. Second, building a pier is as much a maritime activity as restoring a mooring facility, Odom Construction Co. v. United States Department of Labor, supra, or assembling a crane for shipbuilding, Kininess.[16] Moreover, Crawford was assigned to his work by a company which, like Odom Construction Co., had substantial amounts of maritime construction work but which usually used Crawford for nonmaritime jobs. Thus the fact that Crawford usually worked land-based construction jobs does not detract from his covered status.[17] Consequently, our precedents establish that Crawford's work brought him within the LHWCA's status requirement.
 
 
 28
 The Fourth Circuit's previously discussed decision in Brown & Root, Inc. v. Joyner, supra, again supports our determination. That Court relied upon pre-1972 decisions construing the term "employer." The pre-1972 Act applied to "an employer any of whose employees are employed in maritime employment ...." LHWCA of 1927, ch. 509, § 2(4), 44 Stat. 1426 (emphasis supplied) (now codified at 33 U.S.C.A. § 902(4)). We reject the suggestion that pre-1972 constructions should be characterized as irrelevant,[18] and agree with the Fourth Circuit's conclusion that activity which has been held to be traditionally maritime prior to 1972 "has not been stripped of its maritime character by the 1972 amendments." 607 F.2d at 1090. The 1972 amendments were not intended to retract or restrict pre-1972 determinations in these respects. Although piers did not meet the Jensen line requirements of the pre-1972 Act, we are confident that these structures were as peculiarly maritime as any drydock, then and now. Cf. Morrison-Knudson Co. v. O'Leary, 288 F.2d 542, 1961 A.M.C. 866 (9th Cir. 1961) (construction of a dam). Certainly the work, and the attendant risk, of constructing a dry dock and a pier is very similar.
 
 
 29
 In conclusion, we hold that Crawford's work in constructing a pier was "maritime employment" and meets the Act's status requirement.[19]
 
 
 30
 Because Crawford's case meets both situs and status requirements, the employer-insurer appellants fail in their challenge to the BRB's order.
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 E. g., Hed v. Duncanson-Harrelson Co., No. 77-260, 7 BRBS 821 (1978); Bakke v. Duncanson-Harrelson Co., No. 77-259, 8 BRBS 36 (1978); Freer v. Duncanson-Harrelson Co., Nos. 76-314 & 76-314A, 9 BRBS 888 (1979). Cf. Fusco v. Perini North River Associates, 601 F.2d 659 (2d Cir. 1979) (construction of pier-like structure for sewage disposal plant), vacated and remanded, 444 U.S. 1028, 100 S.Ct. 697, 62 L.Ed.2d 664, on remand, 622 F.2d 1111 (2d Cir. 1980)
 
 
 [2]
 The beams in this case were steel, but they are often made of wood. These strut beams are used only to support the forms for the concrete. Thus the beams are securely attached to the pilings, but are not a permanent part of the pier. After the concrete has been poured and has set, the beams are removed, so that only the concrete remains
 
 
 [3]
 § 903
 (a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including and adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). No compensation shall be payable in respect of the disability or death of-
 (1) A master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net; or
 (2) An officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof.
 
 
 [4]
 § 902
 (3) The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.
 
 
 [5]
 There is arguably a third jurisdictional confine: Trotti & Thompson must have been a statutory employer within the meaning of 902(4):
 The term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).
 Cf. Walter Tantzen, Inc. v. Shaughnessy, 601 F.2d 670 (2d Cir. 1979), vacated and remanded, --- U.S. ----, 100 S.Ct. 1879, 64 L.Ed.2d 257, modified on remand, 624 F.2d 5 (2 Cir. 1980). This confine was argued before the BRB, which found Trotti & Thompson to be such an employer. On appeal appellants do not contest the BRB's finding on this point and it is therefore deemed abandoned. Galtieri v. Wainwright, 582 F.2d 348, 352 n.8 (5th Cir. 1978). Accordingly, we do not reach the "employer" issue.
 
 
 [6]
 Even before Nacirema there were anomalies. See T. Smith & Son, Inc. v. Taylor, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520, 1928 A.M.C. 447 (1928) (longshoreman knocked from dock to water by pierbased sling not covered), and Minnie v. Port Huron Terminal Co., 295 U.S. 647, 55 S.Ct. 884, 79 L.Ed. 1631, 1935 A.M.C. 879 (1935) (longshoreman knocked from vessel to pier by ship's hoist was covered). That test looked to whether the "substance and consummation of the occurrence which gave rise to the cause of action" took place on the land or seaward side of the Jensen line. Whatever its exact nature, the Act as construed was frequently anomalous in its coverage
 
 
 [7]
 Crawford concedes as much, since he does not rely upon the concurring opinion of BRB Member Miller, who opined that Crawford was injured on a portion of the uncompleted wharf which was not yet "permanently attached to the shore." The Director of the Office of Workers' Compensation Programs, United States Department of Labor states: "We are frankly uncertain from the record in this case whether the factual basis of this opinion (of Member Miller) is correct, and we accordingly do not rely on it."
 
 
 [8]
 But cf. Larson, The Conflicts Problem Between the Longshoremen's Act and State Workmen's Compensation Act under the 1972 Amendments, 14 Houston L.Rev. 287, 294 ("As a matter of punctuation and grammar, it would appear that the qualifying clause at the end ('customarily used,' etc.) modifies only the words 'other adjoining area.' If it had meant to modify the words 'pier,' 'wharf,' 'terminal,' etc., a comma would have been placed after the words 'other adjoining area.' ")
 
 
 [9]
 Although several of the Perdue claimants subsequently sought Supreme Court review, Skipper did not. Thus Pfeiffer's partial affirmance of Perdue has no relevance to Skipper's case
 
 
 [10]
 Whether or not an employer or local custom has decided to designate an area as a "terminal", for example, is not dispositive of the situs issue. We will require that a putative situs actually be used for loading, unloading, or one of the other functions specified in the Act. As with the "maritime employment" test, we also interpret the Act as requiring that the situs meet the statutory requirements as of the time of the injury. It will not suffice if the area was so used only in the past, or if such uses are merely contemplated for the future
 Jacksonville Shipyards, Inc. v. Perdue, supra, 539 F.2d at 541, 1976 A.M.C. at 1944 (emphasis supplied).
 
 
 [11]
 In Alabama Dry Dock & Shipbuilding Co. v. Kininess, supra, we held that an existing "back lot" to a shipyard in which machines used for shipbuilding were stored and repaired was "customarily used" for "work directly related to shipbuilding...." 554 F.2d at 178, 1977 A.M.C. at 1653. That finding, along with the physical location of the lot "within a contiguous shipbuilding area which adjoins the water," id., satisfied the situs requirement. Kininess therefore established that a contiguous area need not be one in which "loading, unloading, repairing, or building a vessel" is actually occurring, but only one "directly related" to those activities
 
 
 [12]
 The site was adjacent to the Elizabeth River. It had been first dredged from the bank of the river back into the Navy Yard. Originally it was filled with water which had been there from time immemorial. After the dredging was finished, the bottom of the excavation was prepared for the concrete floor which was poured under water. The construction of the side walls was then begun, and when the work had reached a certain point a cofferdam was erected at the river end of the dock and the water was pumped out to permit the completion of the structure. The dock was dry, the concrete floor had been very nearly finished and the concrete side walls had been partly installed when the accident occurred
 The temporary withdrawal of the water did not destroy the federal jurisdiction. It was so held in Butler v. Robins Dry Dock Co., 240 N.Y. 23, 147 N.E. 235, where an employee was injured in the course of his employment outside a vessel in a graven drydock from which the water had been withdrawn. The court held that in the eye of the law he was constructively standing in navigable waters at the time of his injury and therefore was not entitled to recover in an action in tort in the state court.
 139 F.2d at 950 & 952, 1944 A.M.C. at 378 & 382.
 
 
 [13]
 Nor was the pier "being built on shore and awaiting the assumption of a maritime relation." The Raithmoor, 241 U.S. 166, 176, 36 S.Ct. 514, 516, 60 L.Ed. 937, 940 (1916)
 
 
 [14]
 See also Weyerhaeuser v. Gilmore, 528 F.2d 957, 1975 A.M.C. 2411 (9th Cir.), cert. denied, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976). The contrary interpretation by the Second Circuit in Fusco v. Perini North River Associates, supra, was recently vacated by the Supreme Court and remanded for "further consideration" in light of Pfeiffer, supra. On remand, the Second Circuit recognized that Weyerhaeuser was the correct interpretation, but nonetheless affirmed its previous disposition. 622 F.2d 1111 (2d Cir. 1980)
 
 
 [15]
 Kininess interpreted our decision in Jacksonville Shipyards, Inc. v. Perdue, supra. One of the fact patterns in that case was the injury to Skipper, discussed above, which occurred while he was dismantling an abandoned dock facility in order to salvage steel. But the steel was intended for construction of a nonmaritime-related manufacturing plant, and thus Skipper's work had no maritime purpose. We denied benefits because of Skipper's work was not "directly involved" with maritime functions such as loading, unloading, repairing, building or breaking a vessel. 539 F.2d at 539-40, 1976 A.M.C. at 1946. In Kininess, the end result of the employee's work was different from Skipper's in that there was relationship to the maritime function of shipbuilding. Just as Kininess, was distinguishable from Skipper's case in that respect, so too Crawford in the instant case was doing work with a substantial relationship to the maritime functions of loading and unloading vessels. Thus even assuming that this aspect of Skipper's case is still good law after Pfeiffer (which contains some suggestion raising doubt), Kininess distinguishes Skipper's case in a manner directly applicable to the instant case
 
 
 [16]
 The employer-insurer appellants advance a further argument. They assert that a carpenter's duties are the same whether building a pier or a bridge or a highway, so that Crawford's work must have been nonmaritime. We agree that the skills used may be similar. But we also observe that many longshoremen's duties, such as those detailed in Pfeiffer (lifting, fastening), are the same as the duties of many nonmaritime workers. Yet those workers were held to have been engaged in maritime employment. Clearly we must look to the purpose of the work, not solely to the particular skills used
 
 
 [17]
 Our case is even a stronger one for coverage than Odom Construction Co. v. United States Dept. of Labor, supra. In that case, Maze had only been assigned to the mooring restoration job for two days when injured. In our case, Crawford was working on building the pier for six months prior to his injury. The employer-insurer in our case ironically refers us to a decision by the Ninth Circuit which in a reverse sort of way we believe supports a further holding, without need to rely on the principles in Odom, that a six month maritime job assignment is sufficient to make Crawford's overall employment maritime. In Cargill, Inc. v. Powell, 573 F.2d 561, 1978 A.M.C. 293 (9th Cir. 1977), a case recently vacated and remanded by the Supreme Court for further consideration in light of Pfeiffer, supra, the Ninth Circuit held that Powell was not covered by the Act even though he had been "occupationally classified as a longshoreman for 17 years...." 573 F.2d at 563, 1978 A.M.C. at 296. The Court found that Powell's duties during the seven months preceding his accident were nonmaritime, and held that it was his most recent tenure which controlled his status. Id. at 564, 1978 A.M.C. at 296. Thus, while Powell's result differs from the one which we reach today, its reasoning concerning the sufficiency of a seven-month time period can easily be applied to Crawford's six-month tenure on the pier construction job. Thus, Powell's reasoning supports our disposition of this case. But in this dynamic area it is safe to say, as the Ninth Circuit cautioned: "We do not decide whether an employee whose duties shifted every week, of every month, may ... qualify under the Act." Id. at 564 n.4, 1978 A.M.C. at 297 n.4
 
 
 [18]
 Pennsylvania Rail Co. v. O'Rourke, 344 U.S. 344, 73 S.Ct. 302, 97 L.Ed. 367, 1953 A.M.C. 237 (1952), established that if only one of an employer's workers was engaged in maritime employment, then the employer was a § 2(4) employer even for a worker who was not engaged in maritime employment. Thus pre-1972 cases involving shipyards and other employers who employed large numbers of maritime employees did not necessarily have to base the "employer" determination upon the worker actually injured. But see Narco Chemical Corp. v. Shea, 419 F.2d 572, 574 (5th Cir. 1969). The Fourth Circuit, in discussing its pre-1972 decisions, states in response that:
 We did not base coverage on the simple proposition that employers were engaged in maritime commerce. Instead, we examined the work of the individual claimants and concluded that is was maritime employment. In reaching this decision, we emphasize that a dry dock is peculiarly a maritime facility.
 Brown & Root, Inc. v. Joyner, supra, 607 at 1089.
 
 
 [19]
 The BRB reached the conclusion that Crawford was engaged in "maritime employment" by holding that he was a "harborworker" as that term is used in § 902(3). The BRB has defined harborworkers to include
 at least those persons directly involved in the construction, repair, alteration or maintenance of harbor facilities (which include docks, piers, wharves, and adjacent areas used in the loading, unloading, repair or construction of ships)....
 Stewart v. Brown & Root, Inc., No. 76-451, 7 BRBS 356, 365 (1978). See also Joyner v. Brown & Root, Inc., Nos. 76-471 & 76-471A, BRBS 606 (1978); Hed v. Duncanson-Harrelson Co., supra ; Bakke v. Duncanson-Harrelson Co., supra ; Hunter v. Duncanson-Harrelson Co., No. 77-433, 8 BRBS 83 (1978); Freer v. Duncanson-Harrelson Co., supra.
 Our examination of the common usage and pre-1972 judicial construction of the term "harborworker" leaves us open as to what Congress intended the term to include. We have found one case which suggests that an employee who paints docks is a "harborworker." DeMartino v. Bethlehem Steel Co., 164 F.2d 177, 1948 A.M.C. 943 (1st Cir. 1947). We leave the correctness of the BRB's definition to another day.