John K. ALFORD, Anthony R. Buller, Hector Cantu and Director, Office of Workers' Compensation Programs, United States Department of Labor, Petitioners,

v.

AMERICAN BRIDGE DIVISION, UNITED STATES STEEL CORPORATION, Respondent.

Nos. 78–1901, 78–1633, 78–1607, 78–1601, 78–1598, and 78–1554.

United States Court of Appeals, Fifth Circuit.

April 15, 1981.

Stephenson, Thompson & Dies, Martin W. Dies, Orange, Tex., Louis Bien, Galveston, Tex., Schechter & Shelton, Michael Shelton, Houston, Tex., Stanley K. George, Port Arthur, Tex., Carin A. Clauss, Sol. of Labor, Laurie M. Streeter, Associate Sol., Mary A. Sheehan, Joshua T. Gillelan and Gilbert T. Renaut, U.S. Dept. of Labor, Washington, D.C., for petitioners.

Kyle Wheelus, Jr., Beaumont, Tex., for respondent.

Before BROWN, GEWIN and POLITZ, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Claimants, John Alford, Anthony Buller and Hector Cantu, employees of American Bridge, appeal from decisions by the Benefits Review Board (BRB) which denied them coverage under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA). Our review for legal errors compels us to reverse the BRB and affirm the Administrative Law Judge (ALJ) with respect to Alford and Buller, and affirm the ALJ and BRB with respect to Cantu.

### The A.B.C.'s of this Case—Alford, Buller and Cantu

This appeal, brought by worker compensation claimants—Alford, Buller and Cantu—and the Director, Office of Worker's Compensation Programs, pursuant to the LHWCA 33 U.S.C.A. §§ 921(c), 901–905, requires us to review three final orders of the BRB excluding the claimants from LHWCA coverage. In reversing the findings of two ALJs and affirming another, the BRB found that the claimants were not "engaged in maritime employment" within the meaning of § 2(3) of the LHWCA, 33 U.S.C.A. § 902(3)[1] because their employer, American Bridge, "did not maintain an ongoing shipbuilding operation." *Jacksonville Shipyards, Inc. v. Perdue*, 539 F.2d 533, 539–40, 544 (5th Cir. 1976), *Halter Marine Fabricators, Inc. v. Nulty*, 539 F.2d 533 *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977) (Nulty's case). The legal conclusions reached in these conflicting findings requires us to concentrate our efforts on the proper construction and interpretation of the terms "employee" and "employer" as used in coverage §§ 902, 903 of the LHWCA.

---

1.

(3) The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.
33 U.S.C. § 902(3) (1976).

We are limited in our review to considering errors of law and making certain that the BRB adhered to its statutory standard of review of factual determinations. *Mississippi Coast Marine v. Bosarge,* 637 F.2d 994 at 996 (5th Cir. 1981). By statute, the BRB is required to apply the same standard of review as that which was formerly applied by the District Court in reviewing compensation orders. 33 U.S. C.A. § 921(b)(3) (Supp. III, 1973); *see also,* 20 CFR § 802.301 (1973); 20 CFR § 801.104 (1977). That is, the factual findings of the ALJ must be accepted unless inconsistent with the law or unsupported by substantial evidence in the record as a whole. *Fulks v. Avondale Shipyards, Inc.,* 637 F.2d 1008 at 1011 (5th Cir. 1981); *Presley v. Tinsley Maintenance Service,* 529 F.2d 433 (5th Cir. 1976). *See also Base Billeting Fund, Etc. v. Hernandez,* 588 F.2d 173 (5th Cir. 1979); *Army & Air Force Exchange Service v. Greenwood,* 585 F.2d 791 (5th Cir. 1978); *Equitable Equipment Co., Inc. v. Hardy,* 558 F.2d 1192 (5th Cir. 1977); *Alabama Dry Dock & Shipbuilding Co. v. Kininess,* 554 F.2d 176 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977). Further, the ALJ's selection of conflicting inferences which seem most reasonable are conclusive. *Cardillo v. Liberty Mutual Ins.,* 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947). It likewise follows that since the BRB's function is more akin to that of a District Court, unlike other agency's policy-making bodies, there is little rationale for our affording a deference to its construction of legislation pertaining to the LHWCA.[2] *Hastings v. Earth Satellite Corp.,* 628 F.2d 85, at 94 (D.C. Cir. 1980); *Pittston Stevedoring Corp. v. Dellaventura,* 544 F.2d 35, 48–50 (2d Cir. 1976) *aff'd. sub nom., Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).

### To Be or Not to Be a Shipyard?

The facts which gave rise to these claims are uncontroverted. American Bridge's division in Orange, Texas, comprises approximately 86 acres on a Sabine River peninsula. This facility was formerly a shipyard, but American Bridge has not launched a vessel there since 1965.[3] Its primary function since that time has been to fabricate steel components of larger structures including not only vessels, but also bridges, steel buildings, and power plants. When custom built modules for vessels weighing several tons each are completed, they are loaded onto ocean-going barges in the Sabine—making their final destination by sea either to Sea Train in New York or to Newport News Shipbuilding in Virginia.

### A. Alford's Case

John Alford was injured on August 8, 1974, when he struck his back on a steel beam while welding a subassembly for a module of an oil tanker in the process of being assembled at Sea Train in Brooklyn, New York. He was immediately transported to the hospital in Orange, but returned to work that day following examination and treatment. He continued to complain of back pains until his last day of work, Au-

2. In cases of conflict between the exclusively adjudicating Board and the Administrative delegate of the Secretary, such deference as is owed to the agency construction belongs to the Director since he has the administrative responsibilities under the LHWCA which are the source of the weight to be given a statutes "agency" construction. *Cf.* CFR § 802.410(b) (1977).

3. From all accounts American Bridge's history is one with roots in shipbuilding. The plant began operation in the early part of 1940 having acquired the inactive facilities of the old Orange Car and Steel Company. Initially, operations were on six acres of land. At that time, the company was known as Consolidated Steel Corporation of Texas. Parts for structural steel buildings were fabricated in one building. In late 1940, the Texas Company obtained a contract to build 12 destroyers for the United States Navy and the company added a division, Consolidated Steel Corporation, Ltd., Shipbuilding Division. A complete shipyard plant was constructed by filling in the remaining 50 acres of surrounding marshland. The shipbuilding division of the Texas Company ceased operations after building over 200 naval vessels for the government. The facilities were purchased by United States Steel Corporation in 1950 and in 1955 placed under the management of American Bridge Division.

gust 21, 1974. Alford eventually underwent back surgery, but he has not returned to work at American Bridge.

At the time of Alford's injury, the steel fabrication shop where he was injured was engaged in five projects; two for Sea Train and three non-maritime projects. This shop is located 300 feet east of the nearest water and 1,000 feet west of where the 80 ton modules are loaded onto the barges.

The ALJ analogized Alford's situation to the shipbuilding worker, "*Nulty*" in *Jacksonville Shipyards*, 539 F.2d at 539, finding that Alford was a "shipbuilder" within the meaning of § 2(3) (*see* n.1 *supra*) of the LHWCA and the module was a "fundamental and integral portion of a specific ship". The BRB reversed on the rationale that there could not be an "ongoing shipbuilding operation" where the employer did not assemble the vessel itself.

### B. Buller's Case

Anthony Buller was injured on June 29, 1976, when a large T-Bar which he was fitting onto steel plates to be welded together fell causing a fracture in his right leg. His module was destined for Newport News. During his three years with American Bridge, Buller had spent about 95 percent of his time working on component part for vessels and in repairing barges afloat on the Sabine River which were owned and used by American Bridge to ferry materials across the peninsula. The shop where Buller worked is approximately 150 yards from the Sabine.

The ALJ likewise concluded that Buller qualified as an "employee" under the LHWCA and that he was covered because he was injured while performing necessary work from a blueprint on a module which was an "integral part of a particular ship".[4] The BRB again reached contra results

based on the reasoning it expressed in Alford's case.

### C. Cantu's Case

Hector Cantu, a maintenance welder, suffered injuries on March 4, 1975, when he fell while moving a 75 pound black diamond signal which he was constructing. The black diamond was to be attached to the top of a barge bound for Newport News. Navigational rules of the U. S. Coast Guard require black diamonds to be attached to tops of barges as daytime indicators when the barges are towing loads exceeding 600 feet. Cantu performed a variety of welding jobs, including maintenance and repair of equipment in the machine shops as well as work on Sea Train barge modules.

The ALJ denied Cantu's claim, finding that he lacked "employee" status as defined by the LHWCA and that the machine shop where he was injured was not shown to be a situs of shipbuilding work. The ALJ reasoned that the metal signal flag was not an "integral part of the module section of any vessel, but merely a traffic sign to other users of the waterways." The ALJ also apparently concluded that the machine shop itself, unlike the structural fabrication shops, was not used primarily for shipbuilding or repair work and thus Cantu was not directly involved in an "ongoing shipbuilding operation." The BRB affirmed the ALJ's holding of employee status, but did not comment on the situs question.

### The One, Two, Three's of Coverage

With the hoisting of these review *standards* and facts we launch our discussion with an examination of the jurisdictional requirements controlling coverage claims under the LHWCA. In order to be covered, (i) claimants must have "employee" status as defined in 33 U.S.C.A. § 902(3) (*see,* n.1 *supra*), (ii) American Bridge must have been claimant's "employer" as defined in 33

---

4. In holding that Buller was an "employee" under the LHWCA, the ALJ reasoned in part:

   If the claimant was performing the same work for Newport News Shipbuilding Company, the question would not even arise as to

whether the claimant was a shipbuilder. The fact that he was working for a different company does not change the nature of his work or the duties that he was performing.
   Vol. I No. 78–1554 at 72.

U.S.C.A. § 902(4)[5] and (iii) alleged injury must have occurred on "navigable waters" within the meaning of that term in 33 U.S. C.A. § 903(a).[6]

### The 1972 Amendments—Full Steam Ahead?

█ There can be no doubt that when Congress passed the 1972 amendments to the LHWCA, it intended to effectuate a uniform compensation system to be applied regardless of whether those working in maritime commerce sustained injury on a vessel or adjoining work areas of navigable waters. From a reading of § 2(3) LHWCA, the claimants to be covered as employees must be shipbuilders. (*See*, n.1 *supra*). In fact, the resolution of this case in the final analysis depends in substantial measure upon the scope and definition of the word "shipbuilding" because the claimants must have been building a ship (status) in an area adjoining navigable waters used by his employer for shipbuilding (situs). In specifically designating "shipbuilders" as a distinct group of covered employees in the new amendments, Congress was using the word shipbuilder as a general term for application to diversified situations and intended to extend the benefits of the LHWCA to all shipbuilders injured in specified areas.

However, because Congress did not intend to extend coverage to *all* who happened into a maritime area, the 1972 amendments added the "status" requirement to the already existing, but now shoreward extended "situs" tests.

### A. Status

Much judicial ink has been applied in attempting to construe the scope of "employee" status. One of the most recent articulations by the Supreme Court in this matter, *P. C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979), focuses on the employee's occupations in terms of workers who perform "some portion of an integral part of a maritime activity" such as cargo loading/unloading or ship repairs. *Pfeiffer*, 444 U.S. at 75, 100 S.Ct. at 333, 62 L.Ed.2d at 231; *accord Texports Stevedore Co. v. Winchester*, 632 F.2d 504, at 511 (5th Cir. 1980) (en banc). *Pfeiffer* was in part a confirmation of a prior Supreme Court opinion, *Northeast Marine Terminal v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (5th Cir. 1977) where the Court had found checkers and terminal laborers covered who performed only a part of what would otherwise indisputably have been an integral "ongoing maritime activity." In keeping with Congressional intent,[7]

5. A statutory employer is
an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).
33 U.S.C. § 902(4) (1976).
American Bridge concedes that it is an "employer" as defined by this section based on longshoring activities of their barges.

6. § 903. Coverage
(a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). No compensation shall

be payable in respect of the disability of death of—
(1) A master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net; or
(2) An officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof.

7. The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide coverage of longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other employees engaged in maritime employment (excluding masters and members of the crew of a vessel) if the injury occurred either upon the navigable waters of the United States or any adjoining pier, wharf, dry dock, terminal, building way,

the Court reasoned that it is not "the procedure [or] the place of performance of the work that is determinative, but the *character* of work." *Caputo*, 432 U.S. at 268, 97 S.Ct. at 2359, 53 L.Ed.2d at 335, (emphasis applied).

In attempting to defeat the present claimant's alleged status, American Bridge initially argues that the "character" of the work here—fabrication—is not specifically mentioned in LHWCA nor "uniquely maritime" as that of longshoring which was found to be covered in *Pfeiffer* and *Caputo*. American Bridge focuses on the employer status to negate employee status by stressing the fact that it is a steel fabricator engaged in all types of steel fabrication. Hence, claimant's work was similar if not identical to unrelated fabrication carried on in the same shop. A similar line of reasoning was recently expressed and rejected in *Bosarge*, where it was argued that because (i) carpenters were not specifically mentioned in the LHWCA and (ii) claimant's general work activities were similar to those performed by land-based carpenters, that claimant/carpenters should not be classified as maritime employees. *Bosarge*, 637 F.2d at 996–998. The Court based its holding on the logic expressed in two other recent Fifth Circuit cases, *Odom Construction Co., Inc. v. United States Department of Labor*, 622 F.2d 110 (5th Cir. 1980) and

*Trotti & Thompson v. Crawford*, 631 F.2d 1214 (5th Cir. 1980). In *Odom* an employee was injured while relocating fallen concrete blocks used for mooring barges and other vessels. The Court found LHWCA coverage because the job being performed clearly had a "realistically significant relationship to 'traditional activity involving navigation and commerce on navigable waters'". *Odom*, 622 F.2d at 113, *quoting Weyerhause Co. v. Gilmore*, 528 F.2d 957, 961 (9th Cir. 1975). *Trotti* involved a land-based carpenter who was injured while constructing a pier. The Court awarded LHWCA benefits because the claimant's activities constituted maritime employment and thus met the status requirement, *Trotti*, 631 F.2d at 1623. Equally supportive is our landmark decision of *Alabama Dry Dock v. Kininess*, 554 F.2d 176 (5th Cir.) *cert. denied*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977) where we responded to the argument that a claimant who was engaged in sand-blasting a crane which was to be used in longshoring activities was not directly involved in shipbuilding because the crane which he was sand-blasting had not yet been assembled. Rejecting this argument, the Court concluded that sand-blasting "was an essential aspect of the employer's ship repairing and shipbuilding enterprise ... and that [m]aintenance of the crane was necessary to enable it to perform its eventual function of haul-

marine railway, or other area adjoining such navigable waters customarily used by an employer in loading, unloading, repairing, or building a vessel.

The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only

to pick up stored cargo for further transshipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment. Likewise the Committee has no intention of extending coverage under the Act to individuals who are not employed by a person who is an employer, i. e. a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment. Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters.
H.Rep.No.92–1441, 92d Cong., 2d Sess. 10–11 (1972); S.Rep.No.92–1125, 92d Cong., 2d Sess. 12–13 (1972), *reprinted in* [1972] U.S. Code Cong. & Ad. News 4698, 4707–08.

ing fabricated ship sections to the water's edge. *Kininess*, 554 F.2d at 178. *See, e.g., Ingalls Shipbuilding Corp. v. Morgan*, 551 F.2d 61, 62 (5th Cir. 1977) (deceased claimant covered while cleaning a steel plate that would later be used for construction or repair of ships);[8] *McCarthy, Inc. v. Bradshaw*, 547 F.2d 1161 (3d Cir. 1977) (fork-lift repairman covered); *Dravo Corp. v. Maxin*, 545 F.2d 374, 376 (3d Cir. 1976) (injured claimant covered while burning steel plates which would ultimately become bottoms and decks of barges); *Jacksonville Shipyard, Inc. v. Perdue*, 539 F.2d 533 (5th Cir. 1976) (shipyard carpenters building wood piece designed to hold a spare wheel directly involved in an ongoing shipbuilding operation).

Judged by these standards for determining employee status as whether claimant's activities (i) had a really significant relationship to traditional maritime activities, (ii) directly further the shipbuilding goals of his employer or were, in essence, an integral part of an ongoing shipbuilding process, we affirm the ALJ's findings that Alford and Buller were "employees"—shipbuilders—within the meaning of 33 U.S.C.A. § 902(3) while fabricating custom-built modules destined to be installed in newly constructed vessels. Significantly, these modules were not interchangeable with any other type of fabricated steel which the company manufactures. This module construction was clearly a fundamental, integral and *essential* step in the process of building vessels.

On the other hand, we do not find "employee" status in the case of Cantu. Even though it may be argued that he performs important tasks in maintenance welding and welding navigational barge signals which are required by the Coast Guard, we do not think this "character" of work qualifies as traditional maritime activity or reaches the level of involvement in the shipbuilding process described as *funda-*

*mental, integral* or *essential*. It was neither an integral part of or a module section to a vessel such as those Alford and Buller had worked on, nor an integral part of a barge which would carry these modules. Rather, it was merely to be used in maritime commerce as a navigational traffic sign and we find this use too tenuous a connection to shipbuilding or ship repairing as required under the LHWCA. Because Congress did not define or apparently intend to specifically delineate the extent and scope of the term "shipbuilder" in the LHWCA, the Courts must necessarily draw these lines of inclusion. We do so here by finding that the particular facts of Cantu's case do not allow LHWCA recovery.

### B. Situs

Besides adding the status requirement for LHWCA coverage, the 1972 amendments broadened recovery by moving the situs line of coverage shoreward to include not only the traditional injuries on "navigable waters" but "any injury occurring upon any adjoining pier, dry dock, terminal, ... or any other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel". 33 U.S.C.A. § 903(a) (*see*, n.6 *supra*). Thus, in order to qualify for LHWCA coverage, the claimants must be located at a proper situs as outlined above. However, just what and where the situs boundary lines are—specifically what constitutes an "adjoining area" —has been and continues to be a subject of much judicial debate. One thing is clear, we have, at least for the present, continued to require a geographic component—the presence of navigable waters—as a situs requisite. *Pfeiffer*, 444 U.S. at 78, 100 S.Ct. at 335, 62 L.Ed.2d at 233.

American Bridge's location on the Sabine River, without question, facially meets this geographic requirement of navigable waters. In addition, as brought out at the administrative hearing for Buller,

---

**8.** The Court in that case concluded:

Morgan's cleaning task was an essential step of the shipbuilding process, and it defies plain meaning of the words "ongoing ship-

building operation" to restrict them to activities that relate to vessels that are already floating.
*Morgan*, 551 F.2d at 62.

this location was not merely incidental but essential to American Bridge's business. Mr. Hale, a company witness, testified that there was no other reasonable way to transport the large vessel modules except by water. Further, there is little doubt based on the decisions of this Circuit that the fabrication shops where Alford and Buller worked were within the boundaries of "adjoining areas customarily used by an employer in . . . building a vessel." (See n. 5 supra). In Kininess, we found a back shipyard lot located some 150 to 2,000 feet from the water's edge constituted an adjoining area. "The test is whether the situs is within a contiguous shipbuilding area which adjoins the water. * * * Furthermore, the lot itself was 'customarily used' for the maintenance and repair work . . . [i]t was an area in which work directly related to shipbuilding was taking place." Kininess, 554 F.2d at 178. In Nulty one of the five cases [9] decided in Jacksonville Shipyards, 539 F.2d 533, we found the situs for a carpenter injured at a shipyard fabrication shop located some 300 feet from the vessel under construction. In a second case, Perdue, the Court found situs lacking where the injury occurred at an administrative office because the "locus of this injury was not customarily used or involved in loading, unloading, building or repairing vessels." Perdue, 539 F.2d at 541–42. However, the Court was quick to disclaim that the non-maritime character of nearby buildings is not a conclusive test for determining LHWCA situs jurisdiction and the better requirement is to look at all the factors and circumstances. Id. Recently, in Texport's Stevedore Co. v. Winchester, 632 F.2d 504, at 511 (en banc) [1980] the Court made the further disclaimer that the situs question should not be based totally on the presence or absence of intervening or surrounding maritime facilities. Instead, the alleged site must have some nexus with the waterfront—contiguous to, border upon, close to, near or neighboring. Texports, 632 F.2d at 514. The Court concluded that a broader interpretation was not only within the spirit of the Congressional purposes of the 1972 amendments but its objectives for providing uniform benefits and covering land-based maritime activity as well. Id.

The gear room which was held covered in Texports was located approximately five blocks from the gate of the nearest Houston Port dock. Texports, 632 F.2d at 507. Based on this aspect of situs and our discussion of case law, we have no trouble in finding situs for fabrication shops at the American Bridge plant. However, this is not the principal argument American Bridge makes concerning the situs issue. American Bridge presents the argument that 33 U.S.C.A. § 903(a) (see n.1 supra) clearly requires the presence of a vessel to make a situs. Because American Bridge did not construct the entire vessel or completely assemble and launch it in or adjacent to navigable waters, the statutory requirement could not be satisfied in the present case. They try to persuade us that the BRB correctly held that it does not constitute "shipbuilding" to fabricate a module that will be put into and become a part of a ship to be built at another place at another time by another employer whose shipyard adjoins navigable waters.

Such a restrictive approach to the situs requirement is not supported by the language of the LHWCA, case law or the underlying congressional purpose prompting the drafting of the LHWCA 1972

---

9. The five cases are Jacksonville Shipyards, Inc. v. Perdue, 539 F.2d 533, vacated and remanded, 433 U.S. 904, 97 S.Ct. 2967, 53 L.Ed.2d 1088 (1977), aff'd on remand, 575 F.2d 79 (5th Cir. 1978), cert. denied, 440 U.S. 967, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979) (Blackmun, J., dissenting) (Perdue); Jacksonville Shipyards, Inc. v. Skipper, 533 F.2d 533 (Skipper); P. C. Pfeiffer Co., Inc. v. Ford, 539 F.2d 533, vacated and remanded, 433 U.S. 904, 97 S.Ct. 2966, 53 L.Ed.2d 1088 (1977), aff'd on remand, 575 F.2d 79 (5th Cir. 1978) aff'd, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979) (Ford); Halter Marine Fabricators, Inc. v. Nulty, 539 F.2d 533, cert. denied, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977) (Nulty); Ayers Steamship Co. v. Bryant, 539 F.2d 533, vacated and remanded, 433 U.S. 904, 97 S.Ct. 2967, 53 L.Ed.2d 1088 (1977), aff'd on remand, 575 F.2d 79 (5th Cir. 1978), aff'd sub nom. P. C. Pfeiffer Co., Inc. v. Ford, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979) (Bryant).

amendments. The requirement of a vessel *per se* at the proposed situs as American Bridge suggests is not mandated by any section of the LHWCA. In fact the act defines "vessel" to mean

> any vessel upon which *or in connection with which* any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter, or bare boat charter, master, officer, or crew member. (emphasis applied)

33 U.S.C.A. § 902(21).

Persuasive also is claimant's analogy between the segmentation of the shipbuilding process and discontinuity injected into the process of loading and unloading vessels. The *Blundo* case discussed in the Supreme Court decision of *Caputo*, 432 U.S. at 253–71, 97 S.Ct. at 2351–2361, 53 L.Ed.2d at 326–337, provides a particularly convincing parallel to the present facts. There, the "stripping" or unloading of containers during which Blundo's injury occurred involved two employers and separate waterfront facilities which ultimately necessitated intermediate transportation of the containers. The Court emphatically rejected the contention that the stripping operation was not a part of a maritime process of unloading the ship, finding it nevertheless to be "clearly an integral part of the unloading process as altered by the advent of containerization," *Caputo*, 432 U.S. at 271, 97 S.Ct. at 2361, 53 L.Ed.2d at 337, and explained:

> We find no significance in the fact that the container Blundo was stripping had been taken off a vessel at another pier and been moved to the site of the injury. Until the container was stripped, the unloading process was clearly incomplete,

the only geographical concern Congress exhibited was that the operation take place at a covered situs. See Part IV, [432 U.S. at 279–81, discussing the § 3(a) situs requirement]. It was precisely Congress' intent to accommodate the mobility of containers and the ability to transport and strip them at locations removed from the ship.

*Caputo*, 432 U.S. at 271 n.33, 97 S.Ct. at 2361 n.33.

The Court's perception of the Congressional intent relevant to *Blundo's* case is generally applicable as well to the factual situation presented in our cases. As the congressional committee reports reflect,[10] the amendments were an effort in part to adapt coverage to an increasing modernized and technological society of which containerization is illustrative in the cargo-handling industry. Equally appropriate is the analogy of module or assembly line techniques in vessel construction. By identical reasoning products which were once produced from start to finish in one plant are now contracted out to "specialized" manufacturers and then shipped to a final assembly point. Present day realities and a changing economy have altered the picture of the traditionally centrally located American Shipyard operation into an "ongoing process of shipbuilding" scattered about on the navigable waterways of the continent. The Third Circuit has expressly adopted this concept in *Dravo Corp. v. Maxin*, 545 F.2d 374 (3d Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977) which involved an assembly-line barge and towboat construction process in which the fabrication shop made large component sections of vessels and sent them on rail cars to another portion of the shipyard where they

---

**10.** It is also to be noted that with the advent of modern cargo-handling techniques, such as containerization and the use of LASH-type vessels, more longshoring work is performed on land than heretofore.

> * * * * * *

The Committee believes that the rights of an injured longshoreman or shipbuilder or repairman should not depend on whether he was employed directly by the vessel or by an independent contractor. H.R.Rep.No. 92–1441, 92d

Cong. 2d Sess. 10, *reprinted in* [1972] U.S.Code Cong. & Ad.News 4698, 4705, 4707–08. In this connection we comment that Newport News and Sea Train both have the capability to completely construct a vessel, yet, they chose to contract out the construction of modules furnishing American Bridge blueprints and materials. The business relationship between these two was, therefore, that of contractor and subcontractor.

were assembled into completed vessels by other workers.

Reviewing our case in light of these considerations, we conclude that the geographic location, the plant history and the "on-going operation" of American Bridge in fabricating component parts of vessels, meets the situs test. Moreover, having already found that claimants Alford and Buller satisfied the status requirement for LHWCA jurisdiction, we are satisfied that the twin test of status and situs have now been met and accordingly, we set aside the BRB's finding against Alford and Buller and now grant them coverage, but affirm the ALJ and BRB's finding of non-coverage with respect to Cantu.

AFFIRMED IN PART; REVERSED IN PART.